91 A.3d 102

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Shiem GARY, Appellee.**

Supreme Court of Pennsylvania.

Argued March 5, 2013.

Decided April 29, 2014.

Hugh J. Burns Jr., Esq., Grady John Gervino, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Kathleen E. Martin, Esq., Levant, Martin & Tauber, P.C., Pottstown, Alan J. Tauber, Esq., Lindy & Tauber, Philadelphia, for Shiem Gary.

David Rudovsky, Esq., Kairys, Rudovsky, Messing & Feinberg, Philadelphia, Leonard Sosnov, Esq., Harrisburg, for PA Association of Criminal Defense Lawyers.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE, MELVIN, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice McCAFFERY.

In this case, we again address the requirements in this Commonwealth for a warrantless search of a motor vehicle.

After consideration of relevant federal and state law, we now hold that with respect to a warrantless search of a motor vehicle that is supported by probable cause, Article I, Section 8 of the Pennsylvania Constitution affords no greater protection than the Fourth Amendment to the United States Constitution. Accordingly, we adopt the federal automobile exception to the warrant requirement, which allows police officers to search a motor vehicle when there is probable cause to do so and does not require any exigency beyond the inherent mobility of a motor vehicle.

On January 15, 2010, Philadelphia Police Officers Baker and Waters were on patrol in their marked car in the area of North 58th Street and Florence Avenue when they observed Shiem Gary (Appellee) driving an SUV with heavily tinted windows. Believing that the level of tint in the windows violated Pennsylvania's Motor Vehicle Code, the officers stopped and approached the SUV. As they did so, they noticed the smell of marijuana emanating from the passenger and driver sides of the vehicle. When Officer Baker asked Appellee if there was anything in his vehicle that the officers "need [to] know about," Appellee responded that there was some "weed." The officers removed Appellee from the SUV, placed him in the police cruiser, and summoned the canine unit. As Police Officer Snyder and his dog, Leo, began to walk around the SUV, Appellee got out of the police cruiser and started running from the scene. With Leo's help, the officers apprehended Appellee and returned him to the police cruiser. The search of Appellee's SUV yielded approximately two pounds of marijuana, found under the front hood in a bag lodged next to the air filter. Opinion of Court of Common Pleas, dated 12/15/10, at 2; Notes of Testimony ("N.T.") Suppression Hearing, 4/28/2010, at 6–11; N.T. Hearing, 6/4/10, at 11–13 (Municipal Court summary of facts of the case). Appellee was arrested and charged with possession of a controlled substance and possession with intent to deliver.[1]

In Philadelphia Municipal Court, Appellee moved to suppress the marijuana recovered from his vehicle, arguing that

1. Respectively, 35 P.S. §§ 780–113(a)(16) and (a)(30).

the warrantless search was illegal because it was not supported by probable cause and was not necessitated by exigent circumstances. The court conducted a hearing on Appellee's suppression motion on April 28, 2010, and on June 4, 2010, the court held that the warrantless search was valid because it was justified by both probable cause and exigent circumstances. More specifically, the court held that probable cause was "strong" based on the "plain smell" of the marijuana emanating from Appellee's SUV. With respect to exigent circumstances, the court found that police had no advance warning that Appellee's vehicle would be stopped or that there would be probable cause to search the vehicle for contraband. The court also determined that Appellee was in custody and that the police were in control of his vehicle at the time of the search, but these determinations did not undermine the court's finding of exigency. N.T. Hearing, 6/4/10, at 13–15. Accordingly, the municipal court denied Appellee's suppression motion, and the marijuana was admitted into evidence. Following a stipulated trial, Appellee was found guilty of both charges and was sentenced to four years' reporting probation.

Appellee filed a petition for a writ of certiorari with the court of common pleas. Following oral argument on September 28, 2010, the court denied the writ. The court observed that a warrantless search of an automobile is permissible where there is both probable cause to search and exigent circumstances necessitating a search. Opinion of Court of Common Pleas, dated 12/15/10, at 3 (citing *Commonwealth v. Casanova*, 748 A.2d 207, 211 (Pa.Super.2000)). In finding probable cause to search, the common pleas court noted the "plain smell" of the marijuana emanating from the vehicle, as well as Appellee's flight from the scene. *Id.* at 5–6. In addition, the court concluded that the following factors constituted exigent circumstances: (1) the lack of advance warning to police that Appellee's vehicle would be stopped and would be part of a criminal investigation; (2) the need for the officers to act quickly to seize contraband from the vehicle; and (3) the determination that Appellee was not under arrest before the search occurred and thus might have been permit-

ted to return to his vehicle and drive away with the contraband. *Id.* at 6.

Appellee appealed to the Superior Court, contending that the warrantless search of his vehicle was unlawful because it was conducted in the absence of any recognized exception to the warrant requirement. Appellee's Statement of Matters Complained of on Appeal, dated 11/22/10, at 1.[2] The Superior Court reversed the order denying Appellee's petition for writ of certiorari, and remanded for a trial without the admission of the seized marijuana. *Commonwealth v. Gary*, 29 A.3d 804, 808 (Pa.Super.2011). Citing the municipal court's finding that Appellee was in police custody prior to the search, the Superior Court concluded that "the circumstances in this case did not evidence an imperative need for prompt police action; neither the lack of advance warning of criminal activity nor any other factor of record resulted in a threat of danger or dissipation of evidence." *Id.* at 808.

This Court granted the Commonwealth's petition for allowance of appeal to address the following issues, as stated by the Commonwealth:

a. Were the police permitted to conduct a warrantless search of defendant's SUV for marijuana where, during a traffic stop, they could smell marijuana emanating from the vehicle, defendant informed police that he had marijuana in the SUV, and the officers had not had the opportunity to obtain a warrant prior to stopping the vehicle?

b. Should this Court adopt the federal automobile exception to the warrant requirement?

*Commonwealth v. Gary*, 615 Pa. 610, 44 A.3d 1146 (2012) (*per curiam*).

In a case such as this where the trial court denied a suppression motion, our standard of review is well-established. We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontra-

2. The Superior Court clarified that Appellee challenged only the trial court's finding of exigent circumstances, not the finding of probable cause. *Commonwealth v. Gary*, 29 A.3d 804, 807 (Pa.Super.2011).

dicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199, 1203 (2007) (citations omitted).

The issues presented implicate the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, which provide, respectively, as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, Amend. IV.

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA Constitution Art. I, § 8.

■ The primary objective of the Fourth Amendment to the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution is the protection of privacy. *Warden v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (stating that the "principal object of the Fourth Amendment is the protection of privacy"); *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) ("The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy."); *Commonwealth v. Waltson,* 555 Pa. 223, 724 A.2d 289, 292 (1998)

(citing *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 897–98 (1991) for the proposition that "this Court has held that embodied in Article I, Section 8 is a strong notion of privacy, which is greater than that of the Fourth Amendment"); *Commonwealth v. Gordon*, 546 Pa. 65, 683 A.2d 253, 257 (1996) (reiterating that legitimate expectations of privacy are protected by Article I, Section 8); *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81, 87 (1988) (reiterating that "Article I, § 8 creates an implicit right to privacy in this Commonwealth"), grant of *habeas corpus* on a separate issue affirmed by *Blystone v. Horn*, 664 F.3d 397 (3d Cir.2011); *Commonwealth v. Mangini*, 478 Pa. 147, 386 A.2d 482 (1978) ("[T]he acknowledged touchstone of the Fourth Amendment [is] to protect one's reasonable expectations of privacy.").

■ As a general rule, for a search to be reasonable under the Fourth Amendment or Article I, Section 8, police must obtain a warrant, supported by probable cause and issued by an independent judicial officer, prior to conducting the search. This general rule is subject to only a few delineated exceptions, including the existence of exigent circumstances. *See Horton v. California*, 496 U.S. 128, 134 n. 4, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("[I]t is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (citations and quotation marks omitted); *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (same); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("We do not retreat from our holdings that the police must, when practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances.") (internal citations omitted); *Commonwealth v. Petroll*, 558 Pa. 565, 738 A.2d 993, 998–99 (1999) (reiterating that Article I, Section 8 and the Fourth Amendment generally prohibit warrantless searches unless an exception such as exigent circumstances applies);

192

*Commonwealth v. Holzer*, 480 Pa. 93, 389 A.2d 101, 106 (1978) (citing an exception to the warrant requirement when exigent circumstances exist, such as where there is a need for prompt police action to preserve evidence or to protect an officer from danger to his or her person).

One exception to the warrant requirement, the precise parameters of which have evolved over time based on decisional law from the U.S. Supreme Court and from this Court, concerns searches and seizures of automobiles. *See, e.g., California v. Carney*, 471 U.S. 386, 390–91, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). There is no question that automobiles are not *per se* unprotected by the warrant requirements of the Fourth Amendment and Article I, Section 8. *See, e.g., Cady v. Dombrowski*, 413 U.S. 433, 439–40, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (stating that "vehicles are 'effects' within the meaning of the Fourth Amendment [even though] for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars"); *Commonwealth v. Baker*, 518 Pa. 145, 541 A.2d 1381, 1383 (1988), *overruled on other grounds, Commonwealth v. Rosario*, 538 Pa. 400, 648 A.2d 1172 (1994) ("It is well established that automobiles are not per se unprotected by the warrant requirements of the Fourth Amendment, and of Art. I, § 8[ ]."); *Holzer, supra* at 106 ("[C]onstitutional protections are applicable to searches and seizures of a person's car," although the need for a warrant to search a car "is often excused by exigent circumstances."); *Commonwealth v. Cockfield*, 431 Pa. 639, 246 A.2d 381, 384 (1968) ("And certainly an automobile is not *per se* unprotected by the warrant procedure of the Fourth Amendment."). However, as we develop *infra*, the precise parameters of these protections have been difficult not only for this Court, but also for the U.S. Supreme Court to articulate and apply consistently. We first examine the development of the automobile exception to the warrant requirement under federal law, and we then consider the concurrent development of the exception in this Commonwealth.

■ At the outset, it is important to recognize that this Court may extend greater protections under the Pennsylvania

Constitution than those afforded under the U.S. Constitution. However, we should do so only where our own independent state constitutional analysis indicates that a distinct standard should be applied. *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 894–95 (1991) (stating that "it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated" and setting forth "certain factors to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania [C]onstitution"); *Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199, 1213 (2007) (holding, after conducting an *Edmunds* analysis, that the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution are coextensive with regard to the open fields doctrine, and concluding that "there is nothing in the unique Pennsylvania experience to suggest that we should innovate a departure from common law and from federal law and reject [this doctrine]"); *Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655, 660 (2000) (quoting *Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427, 431 (1999), for the proposition that we should apply the prevailing federal constitutional standard to our state constitutional provisions "where our own independent state analysis does not suggest a distinct standard"). We have also concluded that, "[w]hile we can interpret our own [C]onstitution to afford defendants greater protections than the federal constitution does, there should be a compelling reason to do so." *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921, 926 (1985) (citation omitted).

The automobile exception was first set forth by the United States Supreme Court in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Carroll,* federal prohibition agents unexpectedly encountered two suspected "bootleggers" in a car traveling on a public road. The agents stopped the car and searched it without a warrant, finding numerous bottles of gin and whiskey. Looking to the early days of Fourth Amendment jurisprudence, the *Carroll* Court cited the historically recognized "necessary difference between a search of a store, dwelling house, or other structure in

respect of which a proper official warrant readily may be obtained[,] and a search of a ship, motor boat, wagon, or automobile, . . . **where it is not practicable to secure a warrant,** because the vehicle can be quickly moved out of the locality or jurisdiction. . . ." *Id.* at 153, 45 S.Ct. 280 (emphasis added).

*Carroll* emphasized the constancy of the requirement for a finding of probable cause to search, but permitted law enforcement officers to make that determination under certain circumstances.

> In cases **where the securing of a warrant is reasonably practicable, it must be used.** . . . In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully . . . unless he can show the court probable cause.

*Id.* at 156, 45 S.Ct. 280 (emphasis added).

Subsequent cases from the high Court made explicitly clear that the impracticability of obtaining a warrant to search an automobile in transit with illicit goods constituted the basis for *Carroll's* holding. *See California v. Carney,* 471 U.S. 386, 390, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (recognizing that "[t]he capacity to be 'quickly moved' was clearly the basis of the holding in *Carroll* "); *United States v. Ross,* 456 U.S. 798, 806–07, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (stating that "the impracticability of securing a warrant in cases involving the transportation of contraband goods . . . viewed in historical perspective, [ ] provided the basis for the *Carroll* decision"). However, numerous post-*Carroll* cases have expanded the application of the federal automobile exception to circumstances where there was no immediate danger that the vehicle in question might be moved or the evidence contained therein might be lost.

For example, in the oft-cited case *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the warrantless vehicular search in question was conducted after police had stopped the vehicle, arrested the occupants for a robbery that had occurred a short time earlier, and then moved the

vehicle to the police station. In upholding the search, the Court reasoned as follows:

> Neither *Carroll, supra,* nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Carroll* and [in *Chambers* ], if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

*Chambers, supra* at 50–51, 90 S.Ct. 1975.

After determining that the car "could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search," the *Chambers* Court concluded that "there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." *Id.* at 52, 90 S.Ct. 1975. "Given probable cause to search, either course is reasonable under the Fourth Amendment." *Id.* at 52, 90 S.Ct. 1975.

The high Court relied on and further clarified *Chambers's* holding in *Michigan v. Thomas,* 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (*per curiam* ), where police stopped the defendant's car for a motor vehicle violation, observed an open bottle of malt liquor on the floorboard, and then arrested him for possession of open intoxicants in a motor vehicle. Pursuant to departmental policy, an officer searched the vehicle prior to towing and impounding it, and found marijuana in the unlocked glove compartment. A second officer then conducted a more thorough search of the car and found a loaded revolver in the air vents under the dashboard. *Id.* at 259–60, 102 S.Ct. 3079. After the defendant was convicted of possession of a concealed weapon, he moved for a new trial, contend-

ing that the firearm was found pursuant to an illegal search and seizure. *Id.* at 260, 102 S.Ct. 3079. Although the trial court denied the motion, the Michigan Court of Appeals reversed, concluding, *inter alia,* that there were no exigent circumstances justifying the warrantless search because both the car and the occupant were in police custody. *Id.* at 260–61, 102 S.Ct. 3079. Reversing the Michigan appellate court and upholding the warrantless search, the high Court stated as follows:

> In *Chambers* [ ], we held that when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody. We firmly reiterated this holding in *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). *See also United States v. Ross,* 456 U.S. 798, 807, n. 9, 102 S.Ct. 2157, 2163, n. 9, 72 L.Ed.2d 57 [572] (1982). It is thus clear that the **justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.**

*Thomas,* 458 U.S. at 261, 102 S.Ct. 3079 (emphasis added).

Thus, while a vehicle's ready mobility was the original justification for the automobile exception to the warrant requirement, the U.S. Supreme Court subsequently broadened this justification to encompass those situations where the vehicle was in police custody and thus was immobilized.

To support further its broadened automobile exception, the U.S. Supreme Court articulated a second justification for the warrantless search of a motor vehicle, to wit, the diminished expectation of privacy in a motor vehicle as compared to a residence or office, due to the pervasive governmental regulation of, and local law enforcement's extensive contact with, motor vehicles. *See, e.g., Cady v. Dombrowski,* 413 U.S. 433,

442, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (recognizing that the original justification for treating motor vehicles differently from houses with regard to warrantless searches had been expanded, and reasoning that "[t]he constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband"). In *California v. Carney*, 471 U.S. 386, 391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the high Court explained further the two justifications permitting warrantless searches of motor vehicles.

> [A]lthough ready mobility alone was perhaps the original justification for the vehicle exception [to the warrant requirement], our later cases have made clear that ready mobility is not the only basis for the exception. The reasons for the vehicle exception ... are twofold. Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.
>
> Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.
>
>   *   *   *   *   *   *
>
> These reduced expectations of privacy derive ... from the pervasive regulation of vehicles capable of traveling on the public highways.
>
>   *   *   *   *   *   *
>
> The public is fully aware that it is accorded less privacy in its automobiles because of this compelling governmental need for regulation.... In short, the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a

magistrate so long as the overriding standard of probable cause is met.

*Carney, supra* at 391–92, 105 S.Ct. 2066 (internal citation and quotation marks omitted).

The *Carney* Court invoked both the ready mobility and the reduced privacy justifications to hold that a warrantless search, based on probable cause, of a fully mobile motor home parked in a public lot did not violate the Fourth Amendment, explaining its reasoning as follows:

[Whether] a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play. First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulations inapplicable to a fixed dwelling.

*Id.* at 392–93, 105 S.Ct. 2066 (footnote omitted).

The high Court relied upon both justifications to reach its holding in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), a case in which the defendant challenged the warrantless, but routine and standard inventory search of his vehicle which had been lawfully impounded for violations of municipal parking ordinances. Reversing the Supreme Court of South Dakota, the high Court held that the search did not violate the Fourth Amendment bar against unreasonable searches and seizures based on the following rationale.

First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. ... [Second,] the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.

*Id.* at 367, 96 S.Ct. 3092 (internal citations omitted).

More recently, the high Court has made it expressly and unmistakably clear that application of the automobile excep-

tion to the requirement for a search warrant requires **only** a finding of probable cause and **not** a separate, distinct, or additional finding of exigency. In other words, the only exigency required under federal law for application of the automobile exception is the inherent ready mobility of a motor vehicle. *See Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (*per curiam* ).

As will be discussed in more detail, *infra,* the high Court in *Labron* corrected a misconception of this Court that, under the Fourth Amendment, the automobile exception was limited to cases in which "unforeseen circumstances involving the search of an automobile are coupled with the presence of probable cause." *Labron,* 518 U.S. at 940, 116 S.Ct. 2485 (quoting *Commonwealth v. Labron,* 543 Pa. 86, 669 A.2d 917, 924 (1995)). Correcting this Court's error, the high Court explained the automobile exception as follows:

If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment [ ] permits police to search the vehicle without more.

*Id.* at 940, 116 S.Ct. 2485.

Similarly, in *Maryland v. Dyson,* 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999), the high Court reversed the Maryland Court of Special Appeals, which had held that application of the automobile exception required not only probable cause but also exigent circumstances that prevented the police from obtaining a warrant. *Id.* at 466, 119 S.Ct. 2013 (citing 122 Md.App. 413, 712 A.2d 573 (1998)). The high Court explicitly stated that under its precedent, "the 'automobile exception' has no separate exigency requirement," but rather requires only a finding of probable cause. *Id.* at 466–67, 119 S.Ct. 2013. The high Court briefly reviewed and explained its precedent as follows:

As we recognized nearly 75 years ago in *Carroll* [ ], there is an exception to [the warrant requirement of the Fourth Amendment] for searches of vehicles. And under our estab-

lished precedent, the "automobile exception" has no separate exigency requirement. We made this clear in *United States v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), when we said that in cases where there was probable cause to search a vehicle "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." In ... [*Labron, supra* at 940, 116 S.Ct. 2485], we repeated that the automobile exception does not have a separate exigency requirement: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more."

*Dyson, supra* at 466–67, 119 S.Ct. 2013 (emphasis omitted).

Thus, there has been an evolution of the high Court's jurisprudence concerning the automobile exception to the warrant requirement. While the early holdings of *Carroll* and *Chambers* relied on the impracticability of obtaining a warrant for a motor vehicle in transit with contraband or evidence of a crime, more recent cases from the high Court have made clear that the impracticability of obtaining a warrant, unforeseen events, or any other exigent circumstances—beyond the inherent ready mobility of a motor vehicle—are not required for application of the automobile exception to the warrant requirement. As the high Court stated in *Dyson, supra* at 466–67, 119 S.Ct. 2013 (*see* excerpt quoted in text, *supra* ), since 1982, the **only** requirement for application of the automobile exception, permitting warrantless search of a motor vehicle under federal law, is a finding of probable cause.

We turn now to Pennsylvania jurisprudence concerning the automobile exception. In some cases from this Court, the defendant's challenge to a vehicular search and/or seizure was raised only under the Fourth Amendment. In other cases, it is not clear from our opinions whether the defendant's challenge was grounded in the Fourth Amendment or Article I, Section 8 of the Pennsylvania Constitution, or both. As we develop *infra*, the unmistakable implication from our cases until the mid–1990's is that this Court considered the federal

and state Constitutions coterminous with regard to application of the automobile exception to the warrant requirement. *See Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697, 708–11 (2002) (Castille, J., concurring) (characterizing *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995), as having "decided the automobile exception question by employing the same coterminous, Fourth Amendment-based construct this Court had developed and followed for years").

In an early case from this Court, *Commonwealth v. Cockfield*, 431 Pa. 639, 246 A.2d 381 (1968), decided two years before the U.S. Supreme Court rendered its decision in *Chambers, supra*, police discovered a murder suspect's automobile parked on the street in his neighborhood, searched it without a warrant, and found incriminating evidence. Although the trial court admitted the incriminating evidence, this Court reversed, holding that it should have been excluded because no exigent circumstances justified the warrantless vehicular search. *Id.* at 384. In reaching this holding, we reasoned as follows:

> [C]ertainly an automobile is not *per se* unprotected by the warrant procedure of the Fourth Amendment. Although it *sometimes* may be reasonable to search a movable vehicle without a warrant, the movability of the area to be searched is not alone a sufficiently "exigent circumstance" to justify a warrantless search. Other circumstances, for instance a serious possibility that the movable vehicle may, in fact, be moved before a warrant can be obtained, are necessary. In this case, the possibility that [the defendant-appellant's] car would be moved is purely conjectural.

*Id.* at 384 (emphasis in original). Importantly, this Court's holding in *Cockfield* was grounded solely in the Fourth Amendment and interpretative precedent from the U.S. Supreme Court; neither the Pennsylvania Constitution nor precedent from this Court was even mentioned in *Cockfield.*

Another early Fourth Amendment case, *Commonwealth v. Smith*, 452 Pa. 1, 304 A.2d 456, 458 (1973) (plurality), was decided three years after the U.S. Supreme Court decided *Chambers*, and had a very similar fact pattern. Specifically, in

*Smith,* police stopped a vehicle within minutes of a robbery/shooting, arrested the suspects therein, seized the vehicle, and drove it to the police station where they conducted a warrantless search and found incriminating evidence. Relying on the U.S. Supreme Court's holdings in *Chambers* and *Carroll,* we upheld the search as constitutional.

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Smith, supra* at 459 (quoting *Chambers,* 399 U.S. at 52, 90 S.Ct. 1975); *see id.* at 459–60 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 463, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality) for the understanding that *Chambers* "held only that, where the police may stop and search an automobile under *Carroll,* they may also seize it and search it later at the police station").[3]

Twelve years later, in a case explicitly decided under the Fourth Amendment, *Commonwealth v. Milyak,* 508 Pa. 2, 493 A.2d 1346, 1348 & n. 3 (1985) (unanimous), police saw two suspects in a robbery, which had taken place only hours before, drive their van into a parking lot and then enter an adjoining restaurant. Observing incriminating evidence of the robbery in plain view by looking into the van windows, police

**3.** *Smith* presaged the difficulties this Court has experienced to this day in considering the automobile exception. The Opinion of the Court in *Smith,* authored by Justice O'Brien, was joined by only one justice; two justices concurred in the result without opinion; and three justices dissented, with one authoring a dissenting opinion. *See Commonwealth v. Smith,* 452 Pa. 1, 304 A.2d 456, 461, 462 (1973) (Roberts, J., dissenting, joined by Nix, J.) (concluding that the warrantless search at issue violated the Fourth Amendment because police had had ample opportunity to procure a warrant, the automobile was safely in police custody at the station, and there was no danger that the accused or their confederates would move the automobile or remove evidence therein). Disagreement as to the legal and factual relevance of the practicability of obtaining a warrant has been a continuing thread in this Court's automobile exception jurisprudence, as we develop in the text, *infra.*

arrested the suspects, placed them in a police car, and then seized the evidence from the van—all without a warrant. Upholding the search and seizure under the Fourth Amendment, we summarized our understanding of the federal automobile exception as follows: "where there exists probable cause related to the vehicle or its occupants, a search of the vehicle is permissible." *Id.* at 1349 (citing, *inter alia, Chambers* ).[4]

As mentioned above, *Cockfield, Smith,* and *Milyak* were decided under the Fourth Amendment. However, from the 1970's through the 1990's, this Court decided several automobile exception cases in which we made no distinction between the protections provided by or the analysis required under the Fourth Amendment and under Article I, Section 8. For example, in *Commonwealth v. Holzer,* 480 Pa. 93, 389 A.2d 101 (1978), a case in which the defendant-appellant challenged the warrantless seizure by police of his vehicle, the constitutional guarantees against unreasonable search and seizure under the Fourth Amendment and Article I, Section 8 were discussed simultaneously, with federal and state citations for the same principles; no distinction was drawn between the protections conferred by the federal and the state Constitutions. *Id.* at 105–07 & n. 4. Pursuant to the undisputed facts of *Holzer,* several hours after the defendant-appellant had been arrested for murder, police officers found his car on a public street, and impounded it while they made application for a search warrant. Following issuance of the warrant, police searched the car and found incriminating evidence. In upholding the seizure of the vehicle, we recognized that "in considering the reasonableness of a given search or seizure of an automobile, the need for a warrant is often excused by exigent circumstance," and we cited two reasons for this exception to the warrant requirement, to wit, the mobility of a vehicle, and the lesser expectation of privacy with respect to an automobile as compared to a home or office. *Id.* at 106 (citing U.S. Supreme

4. Although *Milyak* was a unanimous opinion, Justice Zappala wrote that he was "compelled to join" the majority because of the appellant's failure to challenge the search on state constitutional grounds. *Milyak, supra* at 1351 (Zappala, J., concurring).

Court opinions in *Chambers, supra,* and *Opperman, supra,* as well as our opinions in *Smith, supra,* and *Commonwealth v. Mangini,* 478 Pa. 147, 386 A.2d 482 (1978)). We held that the warrantless seizure of the vehicle was proper because it was reasonable "for police to seize and hold a car until a search warrant can be obtained, where the seizure occurs after the user or owner has been placed into custody, where the vehicle is located on public property, and where there exists probable cause to believe that evidence of the commission of a crime will be obtained from the vehicle." *Id.* at 106 (footnote omitted). We also recognized the possibility that, even though the suspect himself was in custody, "the car could easily have been removed from the area and its evidence lost." *Id.* at 107.

In another case apparently decided under both the Fourth Amendment and Article I, Section 8, this Court upheld the warrantless search of a vehicle driven by the defendant-appellant, which police officers had stopped just thirty minutes after receiving reliable information that he had assaulted an individual with a firearm. *Commonwealth v. Baker,* 518 Pa. 145, 541 A.2d 1381, 1383 (1988) (unanimous), *overruled on other grounds, Commonwealth v. Rosario,* 538 Pa. 400, 648 A.2d 1172 (1994). Police found a revolver in the vehicle and then arrested the defendant-appellant. *Id.* at 1382–83. This Court held that, "[i]nasmuch as the requirement of probable cause was satisfied, the exigencies of the mobility of the vehicle and of there having been inadequate time and opportunity to obtain a warrant rendered the search proper." *Id.* at 1383. "In short, this case presents a typical scenario where exigent circumstances made it not reasonably practicable to obtain a warrant prior to stopping a vehicle that contained evidence of a crime." *Id.* at 1384. Citing *Milyak, supra,* we also noted that, as an alternative to the immediate search of the defendant-appellant's car, police could have immobilized it while they secured a warrant. *Baker, supra* at 1383. However, because "it is not clear that the intrusion arising from immobilization of an automobile is less than the intrusion of searching it[,] immobilization has been held to be an alternative, not a requirement. *Id.* (citing *Milyak, supra* at 1349–51).

Three years later, in *Commonwealth v. Rodriguez*, 526 Pa. 268, 585 A.2d 988 (1991), a case decided under the Fourth Amendment, we relied on *Baker's* analysis to hold that another vehicular search, with yet again very different circumstances, was proper. In *Rodriguez*, police had received reliable information that the defendant-appellant would be delivering drugs in York on a particular day, but because she had used several different vehicles when delivering drugs on prior occasions, police did not know which vehicle she would be using on the day in question. *Id.* at 989–91. Police observed the defendant-appellant in one of her vehicles on the appointed day in York County, stopped the vehicle, conducted a warrantless search of the vehicle, found cocaine and a large amount of cash therein, and then arrested her. *Id.* at 989. We upheld the search, concluding that "where police do not have advance knowledge that 'a *particular* vehicle carrying evidence of crime would be parked in a *particular* locale, the exigencies of the mobility of the vehicle and of there having been inadequate time and opportunity to obtain a warrant rendered the search without a warrant proper'." *Id.* at 991 (emphases in original) (quoting *Baker, supra* at 1383).[5]

Thus, in *Holzer, Baker,* and *Rodriguez,* this Court's analysis of the applicability of the automobile exception to the warrant requirement was similar, revealing no apparent distinction between the Fourth Amendment and Article I, Section 8 with respect to the elements of that exception. This approach continued in three cases decided within days of each other in late 1995. *See Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896 (1995); *Commonwealth v. Labron,* 543 Pa. 86, 669 A.2d 917 (1995) ("*Labron I* "), *rev'd and remanded, Pennsylvania v. Labron,* 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), *prior order reinstated,* 547 Pa. 344, 690 A.2d 228 (1997)

5. In *Rodriguez,* Justice Flaherty authored a dissent joined by two other justices, in which he opined that a "warrant could plainly have been issued to allow a search of whatever vehicle appellant might be driving into the York vicinity on [the day in question]." *Rodriguez, supra* at 992, 994 (Flaherty, J., dissenting). Accordingly, the dissent would have held that the warrantless search was improper and the evidence was inadmissible.

(Opinion Announcing the Judgment of the Court) (*"Labron II "*); *Commonwealth v. Kilgore,* 544 Pa. 439, 677 A.2d 311 (1995) (*"Kilgore I "*), *rev'd and remanded, Pennsylvania v. Labron,* 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), *prior order vacated, Commonwealth v. Kilgore,* 547 Pa. 346, 690 A.2d 229 (1997) (Opinion Announcing the Judgment of the Court) (*"Kilgore II "*).

In each of these cases, police conducted a warrantless search of the defendant's motor vehicle and found illegal drugs. In each of these cases, the defendant sought to exclude the drugs from the trial proceedings, and the Commonwealth argued that they were admissible as evidence under the automobile exception to the warrant requirement. *White, supra* at 898–901; *Labron I, supra* at 918–20; *Kilgore I, supra* at 312–13. In each of these cases, although there was no issue as to the existence of probable cause, this Court held that the warrantless search was illegal and the evidence had to be suppressed because no exigent circumstances prevented the police from securing a warrant. *White, supra* at 900–01 (holding that the automobile exception was not applicable because there were no unforeseen circumstances, and explaining that police had had ample time and opportunity to secure a warrant for the search of the defendant's car, just as they had secured warrants for the search of his residence and person); *Labron I, supra* at 923–25 (citing, *inter alia, White,* in holding that exigent circumstances did not exist and the automobile exception was therefore inapplicable because police knew well in advance of the challenged warrantless search that a particular vehicle, carrying evidence of a drug-related crime, would be parked in a particular location); *Kilgore I, supra* at 313 (citing, *inter alia, Labron I,* in holding that the automobile exception did not apply to the challenged warrantless vehicular search because there were no exigent circumstances to justify the failure to obtain a warrant, and explaining that the defendant-appellant was in custody and one of the three police officers on the scene "[c]learly ... could have secured the vehicle while a search warrant was obtained").

Thus, very importantly, the determinative principle upon which *Kilgore I*, *Labron I*, and *White* all relied was the same (and was also consistent with the holdings of *Baker* and *Rodriguez* ), to wit, that application of the automobile exception to the warrant requirement required both probable cause **and** exigent circumstances beyond the mobility of the vehicle, which had prevented the police from securing a warrant prior to conducting the search. In *Kilgore I*, *Labron I*, and *White*, this Court concluded that exigent circumstances were lacking, and therefore the automobile exception was inapplicable and the evidence in question had to be suppressed.

Despite the factual, analytical, and legal similarities in *White*, *Labron I*, and *Kilgore I*, the challenges in each case and the decisions rendered were not grounded in the same constitutional provisions. *White, supra* at 899, was decided under Article I, Section 8; *Kilgore, supra* at 314, was decided under the Fourth Amendment; and the basis for *Labron's* decision required a trip to the U.S. Supreme Court to clarify, as we discuss immediately below.

The Commonwealth sought review by the U.S. Supreme Court in *Kilgore* and in *Labron*.[6] The high Court granted certiorari and reversed in both cases, determining that this Court's "holdings rest[ed] on an incorrect reading of the automobile exception to the Fourth Amendment's warrant requirement." *Pennsylvania v. Labron*, 518 U.S. 938, 938–39, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). As we have already discussed in the text, *supra*, the high Court made explicitly clear that the federal automobile exception has no exigency requirement beyond the inherent mobility of a vehicle. *See Labron*, 518 U.S. at 940, 116 S.Ct. 2485 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

---

**6.** The Commonwealth did not seek review of *White* by the U.S. Supreme Court. *See Pennsylvania v. Labron*, 518 U.S. 938, 942, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (Stevens, J., dissenting). Presumably, this was because, as we have discussed in the text, *supra*, *White* explicitly stated that the appellant's challenge was grounded in the Pennsylvania Constitution.

On remand from the U.S. Supreme Court, this Court vacated the *Kilgore I* order which had reversed the Superior Court's affirmance of the defendant-appellant's judgment of sentence. We merely reiterated that *Kilgore I* had been decided under Fourth Amendment law, as the defendant-appellant had not preserved a claim under the Pennsylvania Constitution, and we recognized that the U.S. Supreme Court had "reversed our previous decision as an improper interpretation of federal law." *Kilgore II*, 690 A.2d at 229–30.

In contrast, in the *Labron* remand, in a one-page opinion, a plurality of this Court merely stated that our holding in *Labron I* had been based on Article I, Section 8 of the Pennsylvania Constitution, and therefore reinstated the previous order, which had upheld the order to suppress the evidence. *Labron II*, 690 A.2d at 228. The Opinion Announcing the Judgment of the Court did not conduct an analysis based on the Pennsylvania Constitution, but merely "explicitly note[d]" that *Labron I* had been decided on state constitutional grounds and relied exclusively on *White*. *Labron II, supra* at 228.

The propriety of the reliance on *White* by *Labron II* and subsequent cases has been strongly questioned, primarily because *White* did not conduct **any** analysis of the automobile exception specifically under the Pennsylvania Constitution. *See Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697, 708–13 (2002) (Castille, J., concurring). Although the *White* Court stated that it was considering the automobile exception under the Pennsylvania Constitution, it cited only U.S. Supreme Court cases and Pennsylvania cases that had relied on federal precedent.[7] At no point in its opinion did the *White* Court

7. For example, *White, supra* at 900, cited *Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346 (1985), but as we have discussed in the text, *supra, Milyak* was decided solely under the Fourth Amendment.

*White, supra* at 900–01, also discussed *Commonwealth v. Ionata*, 518 Pa. 472, 544 A.2d 917 (1988) (plurality), which, as the product of an evenly divided Court, affirmed the Superior Court's order affirming the trial court's grant of a motion to suppress evidence discovered in a warrantless search of the defendant's automobile. In *Ionata*, police had secured a search warrant for the person and residence of the defendant based on reliable information from two individuals that he

provide **any** analysis of the contours of the automobile exception specifically under the Pennsylvania Constitution. Rather, the *White* Court began its analysis as follows:

The so-called "automobile exception" to the requirement for a search warrant is perhaps best articulated in *Chambers v. Maroney*[, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ]:

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. *Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. Carroll, supra,* holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and

was dealing in illegal drugs; however, police had not sought a search warrant for his automobile. When the defendant drove up to his residence and parked his car, police officers approached him, noticed glassine bags protruding from the lid of a box on the front seat of the car, searched his car, found therein numerous bags of illegal drugs and paraphernalia used in the drug trade, and then arrested him. *Id.* at 918–19 (Opinion in Support of Affirmance, Flaherty, J.) ("OISA"); *id.* at 921–22 (Opinion in Support of Reversal, Papadakos, J.) ("OISR"). In the OISA, *id.* at 920–21, three justices concluded that suppression of the evidence seized from the car was "entirely proper" because there were no exigent circumstances and "obtaining a warrant would certainly have been practicable." The OISA, *id.* at 920, reasoned that "police had, through oversight or lack of planning, failed to obtain a warrant to search a vehicle that they knew [at least four] hours in advance would be parked at [the defendant's] apartment after it had been used to transport contraband."

In two separate Opinions in Support of Reversal, three justices strongly disagreed. *See id.* at 921 (OISR, McDermott, J.) ("[T]his decision trivializes the fourth amendment."); *id.* (OISR, Papadakos, J.) (relying on *Milyak, supra,* to conclude that the warrantless search was proper because police had independent probable cause).

To the extent that *White* relied on *Ionata,* the reliance is misplaced, as *Ionata* was a plurality decision. *See Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 750 (1998) (stating that a plurality decision has no precedential value).

the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible." [*Chambers,*] 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970) (Emphasis added). In sum, the general rule is that a search warrant is required before police may conduct any search. As an exception to this rule, police may search a vehicle without a warrant where: (1) there is probable cause to believe that an automobile contains evidence of criminal activity; (2) unless the car is searched or impounded, the occupants of the automobile are likely to drive away and contents of the automobile may never again be located by police; (3) police have obtained this information in such a way that they could not have secured a warrant for the search, *i.e., there are exigent circumstances.*

*White, supra* at 899–900 (emphasis in original).

The *White* Court then summarized its understanding of the automobile exception as follows:

[A]lthough the Fourth Amendment generally requires probable cause to be determined and a warrant to be issued by a magistrate before a search may be conducted, unforeseen circumstances involving the search of an automobile coupled with the presence of probable cause, may excuse the requirement for a search warrant.

*Id.* at 901.

Although *White* quoted the *Edmunds* factors, *White* did not conduct an analysis based on any of the factors; did not discuss Article I, Section 8 or any other provision of the Pennsylvania Constitution; and did not consider, much less determine, that some unique aspect of Pennsylvania's constitutional experience required a divergence from federal law with regard to application of the automobile exception. *See Perry, supra* at 710–11 (Castille, J., concurring) ("nothing in *White* remotely suggested that the Pennsylvania Constitution commanded a fundamentally different approach to the automobile exception than is employed under the Fourth Amendment"). Rather, the most logical reading of *White,* as well as of *Labron*

*I*, is that the Court considered the Fourth Amendment and Article I, Section 8 to be coterminous regarding application of the automobile exception, and interpreted the Fourth Amendment to require, for application of the automobile exception, not just probable cause, but also the exigent circumstance of unforeseeability.[8]

However, as we have discussed *supra*, this Court's articulation of the automobile exception in *White, Labron I*, and *Kilgore I* constitutes neither an accurate expression of the federal automobile exception as it exists today, nor as it existed in December 1995, when *White* was decided. *See Perry, supra* at 708–13 (Castille, J., concurring) (discussing *White's* "misapprehension" of federal law). We recognize that the language of some early U.S. Supreme Court cases that initially set forth the automobile exception certainly did suggest the requirement for an unexpected and unforeseeable development of probable cause in order to uphold the warrantless search of a motor vehicle. But it is now beyond cavil that

---

**8.** The Opinion Announcing the Judgment of the Court in *Labron II* did not correctly characterize *White's* holding and analysis. Specifically, it stated as follows:

In *White*, we discussed the automobile exception and noted that, "this Court, when considering the relative importance of privacy as against securing criminal convictions, has struck a different balance than has the United States Supreme Court, and under the Pennsylvania balance, an individual's privacy interests are given greater deference than under federal law." [*White*,] 669 A.2d at 902. Following this citation to *White*, we concluded in *Labron [I]* that "this Commonwealth's jurisprudence of the automobile exception has long required both the existence of probable cause and the presence of exigent circumstances to justify a warrantless search." [*Labron I*,] 669 A.2d at 924.

*Labron II, supra* at 228.
Two points must be made here which strongly call into question the above reasoning from *Labron II*. First, the *White* quotation, *supra*, upon which *Labron I* was said to rely, did **not** appear in the context of a discussion of the automobile exception in *White*. Rather the quotation appeared in the context of an analysis of whether the challenged vehicular search in *White* could be justified as a search incident to arrest. *See White, supra* at 902. Second, *Labron I* did not quote *White*—or any other precedent—for the principle that this Court has afforded greater deference than has the U.S. Supreme Court to an individual's privacy interests. *See Perry, supra* at 710 (Castille, J., concurring) (raising the same two points about *Labron II's* erroneous characterization of *Labron I* and *White* ).

the unexpected and unforeseeable development of probable cause is **not** required for application of the exception under federal law—and has not been since 1982.[9]   As the U.S. Supreme Court stated in *Dyson, supra,* decided in 1999,

> [U]nder our established precedent, the "automobile exception" has no separate exigency requirement.   We made this clear in [*Ross, supra* at 809 [102 S.Ct. 2157], decided in 1982], when we said that in cases where there was probable cause to search a vehicle "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained."

*Dyson,* 527 U.S. at 466–67, 119 S.Ct. 2013 (emphasis omitted).

In sum, it is difficult to read objectively this Court's precedent, especially the *White, Labron,* and *Kilgore* decisions, and not conclude that, at least until 1995, this Court continued to consider the Fourth Amendment of the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution to be coextensive with regard to the automobile exception to the warrant requirement.   Most importantly, this Court concluded that an exigency beyond the mobility of the vehicle was a requirement for application of the automobile exception under early U.S. Supreme Court precedent, and this Court maintained and applied that view of the automobile exception for many decades.   There is certainly language in early U.S. Supreme Court automobile exception cases to suggest an exigency requirement related to unforeseeability or potential loss of evidence.   However, while the federal automobile exception evolved to require only probable cause to search an

9. We note that, more than two years before *White* was decided, the Superior Court set forth a clearer and more accurate interpretation of federal law regarding the automobile exception.

> We note the discrepancy between some of the Commonwealth's past cases and federal cases which speak to automobile searches.... United States Supreme Court decisions clearly indicate[ ] that there exists an "automobile exception" to the warrant requirement.   This [exception] under federal law has developed close to a *per se* rule that whenever the police stop a suspect with probable cause to believe his automobile contains evidence of crime, they may legally search the vehicle without a warrant.

*Commonwealth v. Camacho,* 425 Pa.Super. 567, 625 A.2d 1242, 1247 n. 2 (1993) (internal citations omitted).

automobile, our decisional law did not so evolve, but rather maintained its adherence to the original formulation of the exception. *See Perry, supra* at 720 (Saylor, J., concurring) (stating that "the United States Supreme Court eventually broadened the [automobile] exception by eliminating the exigency requirement, *see California v. Carney,* 471 U.S. 386, 393 [105 S.Ct. 2066, 85 L.Ed.2d 406] (1985), while this Court has adhered to the original formulation"). Unfortunately, it is undeniable that at no point did this Court conduct an *Edmunds* analysis—or any other analysis for that matter—to probe and delineate the elements of the automobile exception mandated specifically under the Pennsylvania Constitution, to determine whether our departure from the evolution of federal law in this area is justified by our unique state constitutional experience. The lack of a thorough, state-specific constitutional analysis has contributed to the confusion and disagreement with regard to the automobile exception that have continued after *White, Labron,* and *Kilgore*—and indeed persist to this date, as is well-illustrated by examination of several cases decided within the past eleven years.

In *Commonwealth v. Perry,* 568 Pa. 499, 798 A.2d 697 (2002), the six-justice Court that heard the case generated four opinions. In *Perry,* the defendant-appellants were in an automobile when they shot at two men in another vehicle, wounding one of them. Responding to the victim's call for help and his description of the assailants, police stopped the defendant-appellants' vehicle moments after the shooting. After the victim identified the defendant-appellants as his assailants, police handcuffed them and placed them in police vehicles. The victim also told police that the defendant-appellants had two guns, one of which he thought was an automatic weapon. An officer returned to the defendant-appellants' vehicle, which was still running and blocking one of two southbound lanes of the road, and conducted a search for weapons. The officer found two firearms, removed them from the vehicle, and drove the vehicle to a police impoundment area. *Id.* at 697–99. Before their trial for attempted murder and related charges, the defendant-appellants challenged the

warrantless search of their vehicle and seizure of the guns. The trial court granted the suppression motion, finding that no exigent circumstances justified the warrantless search. *Id.* at 699. The Superior Court reversed, determining that there were exigent circumstances with regard to police and public safety. *Id.* This Court granted allowance of appeal to determine whether exigent circumstances excused the warrantless search of the defendant-appellants' automobile.

In a single justice Opinion Announcing the Judgment of the Court ("OAJC"), then-Justice Cappy relied on *White* for his statement of Pennsylvania law regarding the automobile exception to the warrant requirement: "there must be a showing of both probable cause and exigent circumstances" for a warrantless search of a motor vehicle to be valid. *Perry, supra* at 700 (OAJC) (citing *White, supra* at 900). Although Justice Cappy recognized that the police had not had the opportunity to obtain a warrant prior to stopping the defendant-appellants' automobile, he nevertheless declined to find exigency on this basis, noting that the defendant-appellants were in police custody and "there was no danger of the automobile leaving with the contents therein," even though the car "was in the middle of a lane of traffic with its engine running." *Id.* at 702–03. However, Justice Cappy held that the exigency of "great potential for deadly harm to the police" rendered the warrantless search of the automobile constitutionally reasonable. *Id.* at 703. In two separate concurring opinions, three justices agreed that the warrantless search was proper, but based this determination on different exigencies. *See Perry, supra* at 718–719 (Castille, J., concurring) (concluding that the warrantless search was proper under our decisional law because of the exigency of the unexpected development of probable cause and the resulting lack of an opportunity to secure a warrant prior to the search); *id.* at 720 (Saylor, J., concurring) (stating that with regard to the automobile exception, this Court's decisional law has indicated that "sufficient exigency is present where, because of the attending circumstances, it was not reasonably practicable for the police to obtain a warrant," and concluding that the facts

of this case presented such a situation). Two justices dissented, determining that there was no danger to police, who "clearly could have secured the scene [with the car running in the middle of the road] and waited with the car while a search warrant was obtained." *Id.* at 722 (Nigro, J., dissenting).

Not surprisingly, *Perry* did not provide guidance, much less precedent, for the next case implicating the automobile exception to come before this Court, *Commonwealth v. McCree*, 592 Pa. 238, 924 A.2d 621 (2007) (Opinion Announcing the Judgment of the Court), the facts of which were as follows. During an undercover investigation of illegal prescription drug sales, two police officers approached the defendant-appellant sitting in his automobile, and one of the officers observed him shove an amber container, which the officer believed to be a pill bottle, under the front seat cushion. After asking the defendant-appellant to step outside the vehicle, the officer reached under the cushion and recovered a bottle of pills later determined to be Xanax. The officer also saw two more pill bottles, later determined to contain OxyContin and Percocet, respectively, in the front door pocket on the driver's side. Prior to trial on possession charges, the defendant-appellant filed a motion to suppress the drugs, which the trial court denied, reasoning that the plain view exception to the warrant requirement allowed the officer to seize the pill bottles. *Id.* at 624–25. The defendant-appellant was convicted of possession with intent to deliver Xanax. *Id.* at 624. On appeal, the Superior Court affirmed. *Id.* at 625.

This Court granted allowance of appeal for the purpose of clarifying the plain view exception to the warrant requirement. *Id.* at 623. After reviewing decisional law from this Court and from the U.S. Supreme Court, the *McCree* OAJC held that the plain view exception to the warrant requirement requires, *inter alia*, a determination of whether the police had a lawful right of access to the object seen in plain view. *McCree, supra* at 628. The OAJC then concluded that the "limited automobile exception" adopted by this Court provided the necessary authorization for police to access the interior of the defendant-appellant's vehicle, and the plain view exception

authorized the seizure of the pill bottles. *Id.* at 631. In applying the "limited automobile exception," the OAJC relied on two determinations: 1) the officers had probable cause to search the defendant-appellant's vehicle; and 2) there was no advance warning that he or his vehicle would be the target of an investigation. *Id.*

With regard more generally to this Court's adoption of a "limited automobile exception," the OAJC explained as follows:

> We have described two reasons why exigent circumstances allow a warrantless search or seizure of a vehicle under Article I, § 8: (1) a vehicle is mobile and its contents may not be found if the police could not immobilize it until a warrant is secured; and (2) one has a diminished expectation of privacy with respect to a vehicle. *Holzer, [supra]* at 106. Thus, even though privacy protections are implicated under Article I, § 8, the heightened privacy concerns involved in a seizure from an individual's person are not present where an object is seized from a vehicle.

*McCree* (OAJC), *supra* at 630.[10]

In a concurring opinion, then-Justice Castille reiterated his view that our holdings with regard to the automobile exception "at most suggest that, if Article I, Section 8 requires an exigency to justify a probable cause-based warrantless entry of a vehicle . . . all that is required is that the probable cause 'arose unexpectedly, *i.e.*, in circumstances that prevented police from securing a warrant before probable cause to search the vehicle arose.'" *McCree, supra* at 635 (Castille, J., concurring) (quoting *Perry, supra* at 717 (Castille, J., concurring)).[11] Thus, although there was not a majority opinion in *McCree*, four justices agreed that, to justify a warrantless search of a motor vehicle, Article I, Section 8 required at most only that probable cause arise unexpectedly.

10. The OAJC in *McCree* was authored by Justice Eakin and joined by Justices Saylor and Fitzgerald.

11. Then-Justice Castille also reiterated his "inclin[ation] to hold that our approach [to the issue of warrantless motor vehicle searches] should be coextensive with the federal approach under the Fourth Amendment." *McCree, supra* at 635 (Castille, J., concurring) (citing *Perry, supra* (Castille, J., concurring)).

In a separate concurring opinion in *McCree*, then-Chief Justice Cappy[12] declined to address the applicability of the automobile exception, pointing out that "the automobile exception in Pennsylvania is the subject of continued controversy," and suggesting that the lead opinion "fail[ed] to acknowledge or critically discuss the differing viewpoints concerning the existence or parameters of such an exception to the warrant requirement." *McCree, supra* at 633 (Cappy, C.J., concurring). Then–Chief Justice Cappy concluded that, under the facts of *McCree*, the search incident to arrest exception to the warrant requirement was applicable and authorized the police to access the immediate interior of the defendant-appellant's vehicle as they were removing him from the vehicle and arresting him.

In *Commonwealth v. Hernandez*, 594 Pa. 319, 935 A.2d 1275 (2007), the Court returned to the issue of threat of harm to police officers or others as a potential exigency, and a majority of the Court recognized a threat of harm as an exigent circumstance that can support application of the automobile exception. In *Hernandez*, a freight shipping manager alerted police to a shipment of many boxes of marijuana. Police stopped the U–Haul truck containing the marijuana, which was driven by the defendant, and directed him to get out of the vehicle. One of the officers opened the rear roll-up door of the truck to see if there was someone else in the truck. The officer observed an open box containing packaging consistent with narcotics. The defendant admitted to police that he had been paid to pick up the shipment, which he knew contained controlled substances. Police then sought and obtained a warrant to search the truck, finding more than 400 pounds of marijuana. *Id.* at 1277–79. Prior to his trial on possession with intent to deliver marijuana, the defendant moved to suppress the admission of the marijuana, asserting that the officer's warrantless entry into the rear of the truck was unlawful, and thus the subsequently obtained warrant, which relied in part on the officer's visual check of the truck's

12. Then–Chief Justice Cappy's concurring opinion was joined by Justices Baer and Baldwin.

rear compartment, was constitutionally defective. The trial court denied the suppression motion, concluding that the limited search of the back of the truck was reasonable in light of the potential danger to police. *Id.* at 1280. The Superior Court reversed. The Commonwealth sought allowance of appeal in this Court, which we granted to determine whether police were authorized to conduct a warrantless search of the truck based on potential danger to the officers. *Id.*

The *Hernandez* Court began its legal analysis by stating that, in Pennsylvania, "we have not adopted the full federal automobile exception under Article I, Section 8." *Hernandez, supra* at 1280 (quoting *McCree, supra* at 629). Rather, "[w]arrantless vehicle searches in this Commonwealth must be accompanied not only by probable cause, but also by exigent circumstances beyond mere mobility." *Id.* We acknowledged the difficulty that this Court has had in determining precisely what satisfies the exigency requirement. *Id.* at 1280–81 (discussing *Perry, supra* ). We then held "without equivocation, that where there is potential danger to police or others in the context of a vehicle stop, exigency has been established for purposes of a warrantless search." *Id.* at 1282. However, in *Hernandez,* because the Commonwealth had not offered any supporting evidence for the police claim of danger from another person in the truck, this Court held that the search was not supported by exigent circumstances and thus was unlawful. *Id.* at 1283. Nevertheless, this Court concluded that the officer's observations of the rear compartment of the truck were not required to support probable cause for the subsequently obtained warrant. Accordingly, this Court held the evidence was admissible.

Then–Justice Castille concurred in the result only, concluding that the search at issue was justified under the automobile exception simply because probable cause arose unexpectedly, and hence it was not reasonably practicable for police to obtain a warrant prior to stopping the defendant's truck. *Id.* at 1285, 1286, 1290 (Castille, J., concurring). The concurring opinion also pointed out that this Court had never conducted "a candid and responsible *Edmunds*-style state constitutional

analysis" to establish "what is demanded by Article I, Section 8 respecting automobile searches." *Id.* at 1286–87. Justice Saylor, joined by Justice Eakin, also filed a concurring opinion in which he joined the majority opinion "[s]ubject to the understanding that [it] addresses itself only to a subset of the circumstances that can reasonably be deemed 'exigent' for purposes of the automobile exception to the warrant requirement as it pertains in Pennsylvania." *Id.* at 1290 (Saylor, J., concurring).

We have reviewed our jurisprudence in the area of automobile searches in such detailed manner in order to reinforce the point that this Court has been unable to articulate a consistent, clear, and readily applicable majority expression of the automobile exception to the warrant requirement. Consequently, local and state police officers have not received essential guidance from this Court as to the circumstances in which the warrantless motor vehicle search, which is a common and important aspect of law enforcement, is permissible in this Commonwealth. Based on the Fourth Amendment, the U.S. Supreme Court has set forth a bright line rule for the automobile exception: police officers may search a motor vehicle if they have probable cause for the search. To begin to alleviate the confusion surrounding the automobile exception in this Commonwealth, we are convinced at this juncture, however belated it may be, that it is essential for us to conduct an *Edmunds* analysis, which focuses on unique aspects of our state constitutional experience, to determine if our state Constitution mandates a stricter standard for warrantless automobile searches than that set forth by the U.S. Supreme Court under the Fourth Amendment.

■ An *Edmunds* analysis encompasses at least the following four factors:

1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; [and] 4) policy consider-

ations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence. *Edmunds,* 586 A.2d at 895.

■ For the reasons set forth *infra,* we hold, based on our analysis of the *Edmunds* factors, that with regard to the warrantless searches of motor vehicles, Article I, Section 8 provides no greater protection than does the Fourth Amendment.[13]

In addressing the first *Edmunds* factor, we must consider the text of Article I, Section 8, which, as we have often observed, is very similar to the text of the Fourth Amendment. *See Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199, 1205 (2007); *Commonwealth v. Chase,* 599 Pa. 80, 960 A.2d 108, 117 (2008) (plurality); *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921, 926 (1985). While textual similarity does not demand identical interpretation, *see, e.g., Commonwealth v. Waltson,* 555 Pa. 223, 724 A.2d 289, 291 (1998), there is nothing in the text of Article I, Section 8 to suggest that it confers greater protection than does the Fourth Amendment with regard to a warrantless search of a motor vehicle.

For the second *Edmunds* factor, we must consider the history of and decisional law concerning Article I, Section 8, as it may be relevant to automobile searches. There is no question that this Court has repeatedly emphasized the strong notion of privacy embodied in that provision of our state Constitution. *See, e.g., Edmunds, supra* at 897. Based sub-

13. We note that our Superior Court in *Commonwealth v. Rosenfelt,* 443 Pa.Super. 616, 662 A.2d 1131, 1132, 1138, 1140–46 (1995), conducted an *Edmunds* analysis concerning the automobile exception to the warrant requirement, in a case in which the trial court had ruled that an illegal substance found in the trunk of the defendant's car was inadmissible as the product of a warrantless, illegal search. The *Rosenfelt* court concluded that Article I, Section 8 afforded our citizens a greater expectation of privacy than did the Fourth Amendment. *Id.* at 1141. Based on this general "great expectation of privacy" as well as on this Commonwealth's strong preference for warrants, the *Rosenfelt* court held that exigency beyond the mobility of the vehicle was necessary for application of the automobile exception to the warrant requirement under Article I, Section 8. *Id.* at 1145–46.

We are unable to agree with *Rosenfelt's* analysis for all the reasons discussed in the text, *infra,* and express disapproval of its holding.

stantially on the paramount concern for individual privacy, this Court has, in certain limited circumstances, afforded greater protections under Article I, Section 8 than are afforded under the Fourth Amendment. *See, e.g., Theodore v. Delaware Valley School District,* 575 Pa. 321, 836 A.2d 76, 84, 88 (2003) (in the context of a challenge to a school district's policy of suspicionless testing of certain students for drug and alcohol use, rejecting the U.S. Supreme Court's Fourth Amendment jurisprudence in favor of a distinct approach under Article I, Section 8, which recognizes "a strong notion of privacy ... greater than that of the Fourth Amendment"); *Commonwealth v. Hawkins,* 547 Pa. 652, 692 A.2d 1068, 1069–71 & n. 1 (1997) (rejecting the decisions of several federal circuit courts to hold that, under Article I, Section 8, an anonymous tip that a man of a particular description at a particular location was carrying a gun does not constitute sufficient justification for police to conduct a stop and frisk pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996) (rejecting the U.S. Supreme Court's Fourth Amendment-based reasoning in *California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and holding that, pursuant to the privacy rights guaranteed under Article I, Section 8, pursuit by a police officer without probable cause or reasonable suspicion constitutes a seizure, and accordingly requires suppression of contraband discarded by the defendant during the chase); *Edmunds, supra* (rejecting the good faith exception to the exclusionary rule set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), based on the protection conferred under Article I, Section 8 of individual privacy rights and of the requirement for a warrant issued upon probable cause); *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989) (relying on the privacy interests protected under Article I, Section 8 to hold that police must obtain a court order based on probable cause prior to installing a pen register, and thus declining to follow U.S. Supreme Court Fourth Amendment precedent); *Commonwealth v. Grossman,* 521 Pa. 290, 555 A.2d 896, 899–900 & n. 3 (1989) (stating that the requirement for specificity with regard to the items to be

seized under a warrant is more stringent under Article I, Section 8 than it is under the Fourth Amendment, based on the text of the two constitutional provisions, and holding that the warrant at issue was deficient in this regard under Article I, Section 8); *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983) (relying on Article I, Section 8 to retain the doctrine of automatic standing, and thus declining to follow U.S. Supreme Court Fourth Amendment precedent); *Commonwealth v. De-John*, 486 Pa. 32, 403 A.2d 1283 (1979) (based on the privacy protections implicit under Article I, Section 8, declining to follow U.S. Supreme Court precedent, and holding that a warrant supported by probable cause was required to access bank records).

However, neither this Court's holdings in the above-listed cases, nor a generally enhanced concern for individual privacy, translates into a conferral of increased privacy protection in every context in which it is asserted under Article I, Section 8. As we have made clear, we do not reflexively find "in favor of any new right or interpretation asserted" under Article I, Section 8. *Russo, supra* at 1210 (citation omitted). Rather, in numerous cases, this Court has concluded that Article I, Section 8 and the Fourth Amendment provide comparable protections, and has accordingly followed the prevailing federal standard. *See, e.g., Russo, supra* at 1200, 1205–13 (after conducting a detailed *Edmunds* analysis, concluding that the open fields doctrine is equally applicable under the Fourth Amendment or Article I, Section 8); *Commonwealth v. Duncan*, 572 Pa. 438, 817 A.2d 455, 459, 469 (2003) (distinguishing *DeJohn, supra*, in holding that the defendant-appellant had no reasonable expectation of privacy under Article I, Section 8 in the name and address information provided by his bank to the police); *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001) (concluding that there was "no reason at this juncture to embrace a standard other than that adhered to by the United States Supreme Court" for stop and frisk cases); *Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655 (2000) (consistent with federal law and the law of most states, holding that anticipatory warrants are not categorically prohibited by Arti-

cle I, Section 8); *Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427 (1999) (applying the federal standard of voluntariness to the question of a consensual search and concluding that Article I, Section 8 does not suggest a distinct standard); *Commonwealth v. Waltson,* 555 Pa. 223, 724 A.2d 289 (1998) (declining to conclude that Article I, Section 8's enhanced privacy rights limit the scope of a lawful search of a single unit residence more than does the Fourth Amendment); *Commonwealth v. Hawkins,* 553 Pa. 76, 718 A.2d 265, 268–69 (1998) (maintaining, under Article I, Section 8, a bar on derivative standing, consistent with federal Fourth Amendment jurisprudence); *Commonwealth v. Williams,* 547 Pa. 577, 692 A.2d 1031, 1039 (1997) (in the context of a challenge to a warrantless search of a parolee's bedroom, concluding that the same standard for the legality of the search applies under Article I, Section 8 or the Fourth Amendment).

Our review of the factual circumstances in the precedential cases summarized above does not suggest that the search of a motor vehicle falls into the category of situations where this Court has required greater protection under Article I, Section 8 than is required under the Fourth Amendment.[14] Furthermore, we reemphasize that our generalized enhanced concern for privacy under Article I, Section 8 is not determinative of the outcome of any specialized assertion of privacy under the particular circumstances of any individual case.

A precedent that is highly relevant to our analysis of the second *Edmunds* factor is this Court's adoption of the federal Fourth Amendment test to determine the scope of protection afforded under Article I, Section 8:

14. We are not ignoring decisions such as *Labron II, supra; McCree, supra;* and *White, supra,* which did suggest greater protections under Article I, Section 8 than under the Fourth Amendment with respect to warrantless automobile searches. We have already discussed these cases in detail in the text, *supra;* indicated that none of them conducted any analysis remotely similar to an *Edmunds*-style analysis or specifically addressed the requirements of the Pennsylvania Constitution in any way; and explained our rationale for concluding that they are of limited precedential or persuasive value to the case before us. *See* text, *supra.*

[I]n determining the scope of protection afforded under Article I, Section 8, this Court employs the same two-part test employed by the United States Supreme Court to determine the sweep of the Fourth Amendment of the U.S. Constitution. That test requires a person to demonstrate: (1) a subjective expectation of privacy; and (2) that the expectation is one that society is prepared to recognize as reasonable and legitimate.

*Russo, supra* at 1211 (internal citation and quotation marks omitted).

This Court has long held that, although the scope of Article I, Section 8's privacy protections extends to a motor vehicle, the protections are diminished therein. *Chase,* 960 A.2d at 119; *McCree,* 924 A.2d at 630 (summarizing that "even though privacy protections are implicated under Article I, § 8, the heightened privacy concerns involved in a seizure from an individual's person are not present where an object is seized. from a vehicle"); *Commonwealth v. Rogers,* 578 Pa. 127, 849 A.2d 1185, 1191 (2004) ("While many in our society have a great fondness for their vehicles, it is too great a leap of logic to conclude that the automobile is entitled to the same sanctity as a person's body."); *Commonwealth v. Holzer,* 480 Pa. 93, 389 A.2d 101, 106 (1978) ("[O]ne's expectation of privacy with respect to an automobile is *significantly* less than that relating to one's home or office.") (emphasis in original).

This Court's determination that the reasonable and legitimate expectation of privacy is diminished in one's motor vehicle, as compared to one's residence or person, is entirely consistent with federal Fourth Amendment jurisprudence. Furthermore, we discern no distinction between the rationale for the reduced expectation of privacy in a motor vehicle set forth by this Court and that set forth by the U.S. Supreme Court. *See California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (stating that "the reduced expectations of privacy [in motor vehicles] derive ... from the pervasive regulation of vehicles capable of traveling on the public highways"); *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (explaining that

the diminished expectation of privacy in a motor vehicle stems from the "pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements" as well as "the obviously public nature of automobile travel"); *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality) (explaining that "one has a lesser expectation of privacy in a motor vehicle because its function is transportation ... [and it] has little capacity for escaping public scrutiny [as] it travels public thoroughfares"); *Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (explaining that local and state police officers have "extensive, and often noncriminal contact with automobiles" due to the extensive regulation of motor vehicles, the frequency with which they can become disabled or involved in an accident on public roads, and the need for officers to investigate automobile accidents); *Rogers*, 849 A.2d at 1191 (explaining that "the exterior of a vehicle is exposed to the public, and is not considered an intimate space"); *Holzer*, 389 A.2d at 106 (citing *Opperman*, 428 U.S. at 367, 96 S.Ct. 3092, to support the principle that the expectation of privacy is diminished in an automobile compared to a home or office); *Commonwealth v. Timko*, 491 Pa. 32, 417 A.2d 620, 623 (1980) (citing *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), when explaining that there is a diminished expectation of privacy in automobiles "because of their open construction, their function, and their subjection to a myriad of state regulations").

Thus, it is undisputable that, under Article I, Section 8, as well as under the Fourth Amendment, there is a diminished expectation of privacy in motor vehicles as compared to a residence, office, or person. No decisions from this Court have suggested that there is a different rationale behind this diminished expectation of privacy under state versus federal law, and, in fact, we have relied upon U.S. Supreme Court opinions in explaining the reasons for it. Given the clearly stated determination by this Court that there is a diminished expectation of privacy in motor vehicles—and no indication that a unique aspect of Pennsylvania constitutional experience

requires that somehow this diminished expectation of privacy is not quite as diminished under state law as under federal law—we must conclude that the second *Edmunds* factor does not militate in favor of conferring greater protection under Article I, Section 8 for automobile searches.

The third *Edmunds* factor requires a consideration of related case law from other jurisdictions. As the Commonwealth addresses, and Appellee concedes, most states have adopted the federal automobile exception. *See* Commonwealth's Brief at 32–35 & n. 8; Appellee's Brief at 28–31. We consider first the experience of several states that have adopted the federal automobile exception under their own constitutions.

In one illuminating example, in 1992, the Supreme Court of Rhode Island adopted, under its own state Constitution, the federal automobile exception as defined by the U.S. Supreme Court. *See State v. Werner*, 615 A.2d 1010 (R.I.1992). More than a decade earlier, in *State v. Benoit*, 417 A.2d 895 (R.I. 1980), the same court had held that, under the Rhode Island Constitution, not only probable cause, but also exigency beyond the inherent mobility of the vehicle were required for application of the automobile exception to the warrant requirement. *Werner*, *supra* at 1012–13. In reaching this holding, the *Benoit* court had noted an apparent inconsistency in U.S. Supreme Court case law with regard to the requirement for exigency in warrantless automobile searches. *Werner*, *supra* (citing *Benoit*, *supra* at 900 n. 1). However, by 1992, when *Werner* was decided, the Rhode Island Supreme Court concluded that federal case law in this area had "been stabilized," via, *inter alia*, the decisions of *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), and *Michigan v. Thomas*, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (*per curiam*). *Werner*, *supra* at 1013. More specifically, in its 1992 *Werner* decision, the Rhode Island Supreme Court determined that "it is clear that exigency is no longer a requirement for the automobile exception to the Fourth Amendment." *Id.* In light of the U.S. Supreme Court's clarification of the exigency issue, and recognizing that any "decision to depart from minimum standards imposed by the

Fourth Amendment should be made guardedly and should be supported by a principled rationale," the Rhode Island Supreme Court "conclude[d] that it is preferable to adopt one clear-cut rule to govern automobile searches and, in turn, eliminate the conflicting interpretations of Article I, section 6, of the Rhode Island Constitution and the Fourth Amendment to the United States Constitution." *Werner, supra* at 1014.

North Dakota's jurisprudential experience in the area of automobile searches has been somewhat similar to that of Rhode Island. In *State v. Meadows,* 260 N.W.2d 328, 332 (N.D.1977), the Supreme Court of North Dakota upheld the warrantless search of the defendant-appellant's automobile under both the Fourth Amendment and Article I, Section 18 of the North Dakota Constitution. The North Dakota Court cited both U.S. Supreme Court cases and state cases in concluding that "the warrantless search of an automobile is justified only where there are exigent circumstances, in addition to probable cause, which require immediate action." *Meadows, supra.* In holding that the warrantless search at issue was justified, the *Meadows* Court noted the following circumstances, all of which contributed to the finding of exigency: the defendant-appellant's vehicle was easily movable; the defendant-appellant was in the immediate vicinity; several individuals, including the defendant-appellant's mother, were aware that law enforcement personnel were looking for him; and it was "conceivable" that evidence could have been removed or the vehicle itself moved from the jurisdiction if police were required to secure a warrant prior to the vehicular search. *Id.* More than thirty years later, the Supreme Court of North Dakota revisited the question of whether exigency was required for application of the automobile exception. *See State v. Zwicke,* 767 N.W.2d 869, 873 (N.D.2009). Citing *Dyson,* 527 U.S. at 467, 119 S.Ct. 2013 the Supreme Court of North Dakota recognized that in the time since it had decided *Meadows,* the U.S. Supreme Court had explicitly held that no exigent circumstances beyond the inherent mobility of the vehicle were required for a probable cause-based, warrantless search of a vehicle. *Zwicke, supra* at 873. The *Zwicke* court

then held as follows: "to the extent that *Meadows* can be read to require something more than mobility for exigent circumstances [in the context of the automobile exception], we overrule that part of our decision in that case." *Zwicke, supra.*

Massachusetts has also changed its requirements for application of the automobile exception over time. In 1990, the Supreme Judicial Court of Massachusetts concluded that, under both the Fourth Amendment and Article I4 of the Massachusetts Declaration of Rights, a warrantless search of a vehicle was justified when police had probable cause and securing a warrant was impracticable because of exigent circumstances. *Commonwealth v. Cast,* 407 Mass. 891, 556 N.E.2d 69, 76 (1990). While acknowledging that, under some circumstances, Article I4 had been interpreted to provide greater protection against unlawful search and seizure than did the Fourth Amendment, the court declined to extend greater protection under Article I4 to the warrantless search of a motor vehicle, and held that a lawful, warrantless search of a vehicle extends to all containers found within. *Id.* at 79–80. Seven years later, in *Commonwealth v. Motta,* 424 Mass. 117, 676 N.E.2d 795 (1997), the Massachusetts high Court recognized that the U.S. Supreme Court had "eliminated the requirement of exigent circumstances to justify the warrantless search of a motor vehicle stopped in transit or seized or searched in a public place." *Id.* at 799 (citing *Pennsylvania v. Labron,* 518 U.S. at 938, 116 S.Ct. 2485). Finding "no compelling reason why the automobile exception should come within [the] special category where art. 14 and Fourth Amendment law diverge," the Massachusetts high Court aligned its law with federal law, concluding as follows: "when an automobile is stopped in a public place with probable cause, no more exigent circumstances are required by art. 14 beyond the inherent mobility of an automobile itself to justify a warrantless search of the vehicle." *Id.* at 800.

Similarly, the Supreme Court of Connecticut has recently reiterated that "under our state constitution, our automobile exception permits a warrantless search of an automobile whenever the police have probable cause to do so." *State v.*

*Winfrey,* 302 Conn. 195, 24 A.3d 1218, 1224 (2011) (quoting *State v. Dukes,* 209 Conn. 98, 547 A.2d 10, 22 (1988)). However, Connecticut does impose a limitation on this general rule by distinguishing on-the-scene searches from searches conducted at the police station: "once an automobile has been impounded at a police station, the factors that justify a warrantless search of the vehicle at the scene—the legitimate safety concerns of police officers and the inherent mobility of automobiles—cease to apply," and hence a warrant is required. *Id.* at 1225 (citing *State v. Miller,* 227 Conn. 363, 630 A.2d 1315, 1325–26 (1993)). The *Winfrey* Court was careful to clarify that *Miller's* limitation was applicable **only** when a vehicle is searched at a police station. "*Miller* does not govern cases where an automobile remains in public and is therefore potentially mobile, even though the driver has been taken into police custody and the police have effective control of the vehicle," because there is a continuing possibility that a vehicle accessible to the public would be relocated or the evidence therein removed by someone other than the arrestee. *Winfrey, supra* at 1226. The Connecticut Supreme Court also questioned the wisdom of requiring police officers to guard the motor vehicle while a warrant is being obtained: "[I]t is unreasonable to require law enforcement officers, who are already tasked with maintaining control of arrestees in insecure and potentially hostile environments, to remain in the field and simultaneously stand a careful and possibly prolonged watch over vehicles likely to contain contraband until a warrant can be procured." *Id.*

Other states have adopted the federal approach. *See State v. Conn,* 278 Kan. 387, 99 P.3d 1108, 1114 (2004) (reiterating that, under state and federal law, the warrantless search of an automobile is justified when probable cause has been established, and explaining that "exigency arises because of the mobility of the vehicle," such that no other exigency is required); *Chavies v. Commonwealth,* 354 S.W.3d 103, 111 (Ky.2011) (reiterating that "Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment;" explaining that an automobile's mobility

is an exigent circumstance, *per se,* and that "mobility refers to the capability of using an automobile on the highways, not the probability that it will be [so] used;" citing U.S. Supreme Court precedent for the conclusion that an "individualized assessment of the likelihood that the car will be driven away or that its contents will be tampered with during the period required to obtain a warrant is unnecessary;" and recognizing the lesser expectation of privacy in a motor vehicle) (internal quotation marks and citations omitted); *State v. Tompkins,* 144 Wis.2d 116, 423 N.W.2d 823 (1988) (holding that exigent circumstances are not required for a probable cause-based, warrantless search of an automobile; stating that Article I, Section 11 of the Wisconsin Constitution provides no greater rights than does the Fourth Amendment of the U.S. Constitution; and reasoning that a federal versus state distinction with regard to the need for exigent circumstances is neither necessary nor appropriate when the texts of the relevant constitutional provisions are nearly identical).

Hence, many states have adopted the federal automobile exception, with some states clearly indicating that they have, over time, modified their requirements with respect to warrantless automobile searches to conform to and/or remain consistent with U.S. Supreme Court jurisprudence in this area, jurisprudence which, as we have discussed above, has undergone its own modifications over time.

In contrast to the above examples, some states have departed from the federal automobile exception based on state constitutional provisions, the texts of which are decidedly different from that of the Fourth Amendment. For example, in *State v. Elison,* 302 Mont. 228, 14 P.3d 456, 471 (2000), the Montana Supreme Court held that there was no automobile exception to the search warrant requirement under the Montana Constitution. Rather, the court held, a warrantless search of an automobile requires not only probable cause, but also "a generally applicable exception to the warrant requirement such as a plain view search, a search incident to arrest, or exigent circumstances." *Id.* Importantly, in reaching this holding, the Montana Supreme Court relied on two provisions

of its state Constitution: Article II, Section 11, the language of which is nearly identical to the Fourth Amendment, and also Article II, Section 10, the unique language of which affords citizens an explicit and greater right to individual privacy. *Id.* at 468–69; Mont. Const., Article II, Section 10 ("The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."). Based on the Montana Constitution's unique and explicit privacy provision, the *Elison* Court found less than compelling the U.S. Supreme Court's analysis as to the reduced expectation of privacy in a motor vehicle, as set forth in *Carney*, 471 U.S. at 391–92, 105 S.Ct. 2066, but rather concluded that the defendant had an actual and reasonable expectation of privacy in the items stowed behind the front seat of his vehicle. *Elison, supra* at 470–71. There was no question that probable cause to search the vehicle was present: the defendant was observed smoking a marijuana pipe in his vehicle; a police officer smelled the odor of marijuana as he approached the vehicle; the defendant admitted to police that there was marijuana in his vehicle; and he had red, glassy eyes. *Id.* at 460–61, 468, 471. But the Montana Supreme Court declined to find exigency, concluding that the mobility of the vehicle was not an exigency *per se;* that there was no evidence of record to support the possibility that a confederate of the defendant might have moved the vehicle or destroyed the evidence therein; and that exigency was not established merely by the lateness of the hour at which the vehicle was stopped or by the likelihood that it would have been difficult to obtain a search warrant at that time of the night. *Id.* at 471. Accordingly, the Montana Supreme Court held that the warrantless search of the defendant's vehicle was unlawful. *Id.*

Similarly, Washington State has not adopted any exception to the warrant requirement specifically for motor vehicles, based on Article I, Section 7 of the Washington State Constitution, which explicitly protects privacy and reads as follows: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." In *State v. Tibbles,*

169 Wash.2d 364, 236 P.3d 885 (2010), the Washington Supreme Court reiterated that "the right to be free from unreasonable governmental intrusion into one's 'private affairs' encompasses automobiles and their contents." *Id.* at 887 (citation omitted). Thus, pursuant to Washington state law, a warrant to search a motor vehicle must be obtained unless the circumstances fall into one of a narrow set of exceptions to the warrant requirement, including exigent circumstances, consent, search incident to arrest, plain view and inventory searches. *Id.* at 888. The only potentially applicable exception in *Tibbles* was the exigent circumstances exception, which applies when "obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape or permit the destruction of evidence." *Id.* at 888 (citation omitted). Although the mobility of a vehicle *could* be an exigent circumstance in some situations, the Washington Supreme Court instructed that the totality of the circumstances must be assessed to determine whether an exigency did indeed exist under the facts of a given case. *Id.* at 888. Based on the totality of the circumstances in *Tibbles,* the Washington Supreme Court concluded that exigent circumstances did not exist, citing the state's failure to set forth evidence of a need for haste, flight by the suspect, imminent destruction of evidence, impracticability of obtaining a warrant, or danger to police or anyone else. Accordingly, the court held that the search of the defendant-appellant's car violated Article I, Section 7 of the Washington State Constitution.

Given that the Pennsylvania Constitution has no provision analogous to Article I, Section 7 of the Washington Constitution, or to Article II, Section 10 of the Montana Constitution, we conclude that the experience of these states is unpersuasive. *See Russo, supra* at 1211 & n. 12 (concluding that the rejection of the federal open fields doctrine by Montana and Washington was unpersuasive because it was based on provisions in the constitutions of those states that explicitly protect individual privacy or private affairs, provisions that have no analogous counterparts in the Pennsylvania Constitution).

Other states have relied on state constitutional provisions that are very similar or essentially identical to the Fourth Amendment in concluding that a warrantless search of a motor vehicle must be supported by exigent circumstances. For example, in *State v. Cooke*, 163 N.J. 657, 751 A.2d 92 (2000), the Supreme Court of New Jersey relied on Article I, paragraph 7 of the New Jersey Constitution and prior state decisional law to hold that the "automobile exception applies only in cases in which probable cause and exigent circumstances are evident, making it impracticable for the police to obtain a warrant." *Id.* at 99. The New Jersey high Court recognized that "the term 'exigent circumstances' is, by design, inexact [and] incapable of precise definition because, by its nature, the term takes on form and shape depending on the facts of any given case." *Id.* at 102. The court counseled that the combination of relevant factors in any given case must be considered in order to assess whether exigent circumstances were present. Factors that the *Cooke* Court considered relevant included: the impracticability of requiring an officer to leave a surveillance post to stand guard over the vehicle at issue; the loss of the element of surprise as to the police investigation or action; and the presence of third parties who might attempt to move the vehicle or destroy the evidence therein while the police awaited a warrant. In *Cooke,* police had conducted a warrantless search of the defendant's car after arresting him during a surveillance operation in an area known for drug-trafficking. Even though police had received reliable information two weeks prior to the search that the defendant was selling drugs in that area and storing the drugs in his car, New Jersey's highest court held, based on the combination of all of the above factors, that exigency had been established, and thus the warrantless search of the defendant's vehicle was justified and the contraband therein was admissible. *Id.* at 102.

In *State v. Gomez,* 122 N.M. 777, 932 P.2d 1 (1997), the Supreme Court of New Mexico explicitly declined to follow the U.S. Supreme Court's Fourth Amendment jurisprudence in interpreting the search and seizure provisions of Article II,

Section 10 of the New Mexico Constitution. While recognizing that in some of its precedents it had followed "in lock-step" the U.S. Supreme Court's interpretation of the Fourth Amendment, the New Mexico Supreme Court in *Gomez* stated that it "no longer follow[s]" federal Fourth Amendment precedent in interpreting Article II, Section 10 of its state Constitution. *Id.* at 11. Accordingly, the *Gomez* Court held that a warrantless search of an automobile requires not only probable cause, but also "a particularized showing of exigent circumstances," which were defined as "an emergency situation requiring swift action to prevent imminent danger to life or serious danger to property, or to forestall the imminent escape of a suspect or destruction of evidence." *Id.* at 12 (citation omitted). The test for exigency prescribed by New Mexico's highest court was an objective one, as to whether a reasonable, well-trained police officer would have determined that exigent circumstances existed. *Id.* The *Gomez* Court upheld the warrantless vehicular search in question based on the officer's reasonable belief that, if an immediate search was not undertaken, one or more of the numerous people milling about at the scene could have removed and/or destroyed the evidence of drug possession and use in the vehicle. *Id.* at 12. While declining to accept the federal bright-line automobile exception, the New Mexico Supreme Court nevertheless acknowledged that "it may be true that in most cases involving vehicles there will be exigent circumstances justifying a warrantless search." *Id.* at 13.

In *State v. Bauder*, 181 Vt. 392, 924 A.2d 38, 50 (2007), a case decided under Chapter I, Article 11 of the Vermont Constitution, the Vermont Supreme Court reiterated that the automobile exception to the warrant requirement requires a showing of both probable cause and exigent circumstances. In holding that the search at issue was unlawful, the Vermont Supreme Court noted that the defendant had been arrested for driving under the influence and was thus in custody; the vehicle was parked in a commercial lot; "the police had not observed any evidence of a crime in the vehicle[;] and there was nothing to indicate that the passenger, who had been

questioned by the police and had departed, would have any reason to return to the vehicle or ability to remove its contents." *Id.* at 50–51.

Thus, in sum, while most states have adopted the federal automobile exception to the warrant requirement, some have not. At least two states, Montana and Washington, have rejected an automobile exception to the warrant requirement based on protections for individual privacy explicitly set forth in their state constitutions. Other states, relying on their distinct interpretations of state constitutional provisions that are similar or nearly identical to the Fourth Amendment, have declined to adopt the federal automobile exception, and have maintained a requirement, not just for probable cause, but also for exigent circumstances beyond the inherent mobility of a motor vehicle. This second group of states has stressed several factors, *e.g.*, the preference for warrants, *see Cooke, supra* at 99 (New Jersey), *Gomez, supra* at 11 (New Mexico), *Bauder, supra* at 43–44 (Vermont); consistent state precedent, *see Cooke, supra* at 97–99; reasonable expectations of privacy, even in an automobile, *see Cooke, supra* at 99, *Bauder, supra* at 42. However, most states have adopted the federal automobile exception, citing, *e.g.*, the inherent mobility of a motor vehicle as a sufficient exigency, *see Winfrey, supra* (Connecticut), *Conn, supra* (Kansas), *Chavies, supra* (Kentucky), *Motta, supra* (Massachusetts), *Zwicke, supra* (North Dakota), *Tompkins, supra* (Wisconsin); the decreased expectation of privacy in a motor vehicle, *see Conn, supra; Chavies, supra, Motta, supra;* the desirability of eliminating or avoiding conflicting interpretations of state and federal constitutional provisions that are very similar if not identical, *see Werner, supra* (Rhode Island), *Motta, supra, Tompkins, supra;* the difficulty and/or undesirability of requiring a law enforcement officer to remain in the field and guard the vehicle while a warrant is being sought, *see Winfrey, supra, Motta, supra;* the difficulty in conducting an individualized assessment of the likelihood that the vehicle will be moved or the evidence therein disturbed, *see Winfrey, supra, Chavies, supra.*

While the variety of state experiences in this area is uniformly informative and of interest, we are more persuaded by the logic and reasoning of the states that have adopted the federal automobile exception than by that of the states that have continued to impose a requirement of exigency beyond the inherent mobility of the vehicle.

For the fourth and final *Edmunds* factor, we must consider the policies implicated by the constitutional interpretations advanced, "including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds, supra* at 895. We believe that this factor militates strongly in favor of adoption of the federal automobile exception, which requires only a finding of probable cause, and no exigency beyond the inherent mobility of a motor vehicle, to support a warrantless vehicular search.

One need only examine this Court's fractured jurisprudence in the area of motor vehicle searches to recognize the difficulty that we have had in articulating a consistent, clear, understandable, and readily applicable conception of exigency sufficient to support a warrantless vehicular search. *See Commonwealth v. Hernandez*, 594 Pa. 319, 935 A.2d 1275, 1280 (2007) ("Precisely what satisfies the exigency requirement for warrantless vehicle searches has been the subject of many of this Court's opinions, some of which include multiple, varying expressions with no clear majority."). Even in the instant case, the Superior Court noted that "[t]he application of th[e] definition [of exigent circumstances] has unquestionably been difficult for the courts of this Commonwealth." *Commonwealth v. Gary*, 29 A.3d 804, 807 (Pa.Super.2011). The current state of affairs falls far short of this Court's responsibility to provide guidance to the bench, prosecutors, defense attorneys, and local and state police officers as to the constitutional requirements for a warrantless vehicular search.

A consideration of some specific examples from our decisional law shows how the determination of exigency—or lack thereof—can turn on small facts in the midst of a complex, volatile, fast-moving, stressful, and potentially threatening situation in the field. For example, we have considered on

several occasions how quickly and specifically probable cause must arise for police—and the reviewing court—to conclude that obtaining a warrant is impracticable. *Compare Commonwealth v. Ionata*, 518 Pa. 472, 544 A.2d 917, 920 (1988) (OISA) (concluding that probable cause arose in time for police officers to have obtained a warrant where they had information four hours prior to a warrantless vehicular search that drugs would be in a particular automobile); *id.* at 921 (OISR) (McDermott, J.) (concluding that the OISA's decision "trivializes the fourth amendment"); *id.* (OISR) (Papadakos, J.) (concluding that the warrantless search was proper because police had independent probable cause); *Commonwealth v. Rodriguez*, 526 Pa. 268, 585 A.2d 988, 993–94 (1991) (Flaherty, J., dissenting) (concluding that police officers had had sufficient opportunity to obtain a search warrant because they had received information as to the anticipated drug sale at least three and one-half hours before stopping the defendant-appellant's car, and noting that a magistrate's office was located just ten minutes from the area where the officers had observed the subject vehicle); *Rodriguez*, 585 A.2d at 989–91 (Majority Opinion) (concluding that police officers had had no opportunity to obtain a warrant where, although they had received reliable information in the morning that the defendant-appellant was coming into the area on that day to sell drugs, they did not know which automobile she would be using, nor did they know in which jurisdiction she would be traveling); and *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896, 899 (1995) (concluding that police officers had had ample opportunity to obtain a warrant where they had received information as to an anticipated drug sale 36 to 48 hours prior to the search, and indicating that the mere fact that police did not know which car would be used to conduct the drug transaction did not constitute an unforeseen circumstance).[15]

15. *Rodriguez* was decided by a 4–3 majority, since two justices (Chief Justice Nix and Justice Zappala) joined the dissent. *White* was decided by a six-member Court, with four justices in the majority, one justice concurring, and one dissenting. In *Ionata*, the Court was evenly divided, and thus the order of the Superior Court was affirmed.

A further difficulty with the assessment of probable cause under some of our decisions is that police officers must determine not only *whether* they have probable cause to search a motor vehicle, but also precisely *when* in the course of their investigation probable cause arose, and whether *at that point*, there was sufficient opportunity to secure a warrant. *See* Commonwealth's Brief at 28; *White, supra* at 909–10 (Castille, J., dissenting). This is a difficult standard to apply, not just for the court, but also, and more importantly, for police officers operating in the field, often in the midst of a fast-moving investigation.

A second example of the complexity and, in some instances, inconsistency, in the area of warrantless motor vehicle searches, is our decisional law as to what circumstances constitute sufficient danger to the police or the public such that an exigency is present, and thus a warrantless vehicular search is justified. *Compare Commonwealth v. Holzer,* 480 Pa. 93, 389 A.2d 101, 106 (1978) (stating that there is an exception to the warrant requirement "where the need for prompt police action is imperative ... because the officer must protect himself from danger to his person by checking for concealed weapons"); *White,* 669 A.2d at 902 n. 5 (indicating that a warrantless search of a motor vehicle may be acceptable where "the police must search in order to avoid danger to themselves or others, as might occur in the case where police had reason to believe that explosives were present in the vehicle"); *Commonwealth v. Perry,* 568 Pa. 499, 798 A.2d 697, 703 (2002) (OAJC) (interpreting *White* to "teach" that exigent circumstances may exist in "an extreme situation in which there is a great potential for deadly harm" and indicating that the situation should also be one that police did not create); *Perry,* supra at 724 (Nigro, J., dissenting) (suggesting that the OAJC "has authorized warrantless searches based merely on the potential for danger to the police, and in doing so, essentially abandons the requirement of exigency"); *Commonwealth v. Hernandez,* 594 Pa. 319, 935 A.2d 1275, 1282 (2007) (holding that "where there is potential danger to police or others in the context of a vehicle stop, exigency has been established for

purposes of a warrantless search," but also stating that "police must be able to articulate the danger posed"); and *Hernandez, supra* at 1288 (Castille, J., concurring) (opining that "there need not be a 'great' potential of deadly danger, but a reasonable potential, or a colorable potential," and advising that this Court "should not adopt a rule under which police must suffer the deadly consequences if their actions somehow 'created' the exigency").[16] Although *Hernandez* explicitly held that danger to police or others may constitute exigent circumstances, the standard by which to assess the danger remains unclear.

Finally, we consider this Court's opinions in response to the question of what—or whether—evidence is required to show that a third party, *e.g.,* an arrestee's cohorts, family, friends, or other persons often completely unknown to police, is likely to move the arrestee's vehicle or tamper with evidence therein. *Compare Commonwealth v. Perry,* 568 Pa. 499, 798 A.2d 697, 702 (2002) (OAJC) (in a case where police stopped a car at 3 a.m. in the middle of a Philadelphia street and arrested the two occupants as suspects in a shooting that had just occurred, stating that "it is uncontested that . . . there was no danger of the automobile leaving [the scene] with the contents therein"); *Kilgore I,* 677 A.2d at 313 (concluding that there were no exigent circumstances to justify failure to obtain a warrant prior to searching a vehicle parked at the residence of the defendant-appellant's father-in-law, who was on the scene, because the defendant-appellant was in custody, three police officers were at the scene, and "[c]learly, one of the officers could have secured the vehicle while a search warrant was obtained"); *Kilgore I, supra* at 314–15 (Castille, J., dissenting) (strongly disputing the majority's claim that a police officer could and should have guarded the vehicle while a warrant was being obtained, based on considerations of safety and law enforcement efficacy and efficiency); *Commonwealth v. Bak-*

16. *White* was decided by a six-member Court, with four justices in the majority, one justice concurring, and one dissenting. *Perry* was also decided by a six-member Court, and generated four opinions. *Hernandez* was decided by a four-justice majority, with three justices concurring in two separate concurring opinions.

*er*, 518 Pa. 145, 541 A.2d 1381, 1381 (1988) (citing *Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346, 1349–51 (1985), for the conclusion that immobilization of a motor vehicle while police obtain a search warrant is not required, but rather is an alternative to an immediate search, because it is not clear that the intrusion of immobilization is less than the intrusion of an immediate search); *Commonwealth v. Holzer*, 480 Pa. 93, 389 A.2d 101, 106–07 (1978) (in a case where, after the defendant-appellant had been arrested for murder, police officers found his car on a public street and seized it, concluding that the warrantless seizure of the vehicle was proper because, *inter alia*, "the car could easily have been removed from the area and its evidence lost"); and *Commonwealth v. Cockfield*, 431 Pa. 639, 246 A.2d 381, 384 (1968) (in a case where police found and searched a murder suspect's car parked on a public street, holding that the warrantless search was not justified because, *inter alia*, the possibility that the car would be moved while police were securing a warrant was "purely conjectural").

Thus, the question of whether, and under what circumstances, a police officer is required to guard a vehicle stopped in a public place while waiting for another officer to secure a search warrant are far from clear. A related issue is whether police must present evidence as to the probability that one or more third parties—who may very well be completely unknown to the officers—might move a vehicle or tamper with the evidence therein while a warrant is being sought. These are fact-intensive issues, far from amenable to articulable rules or some other form of judicial guidance that law enforcement officers operating in the field could readily apply.

As the cases summarized and compared above make clear, our fractured jurisprudence in the area of warrantless motor vehicle searches has often turned on small details in the midst of a complex factual scenario, details which have been given varying emphasis over time by different members of this Court. Accordingly, it remains difficult, if not impossible, for police officers in the field to determine how this Court would rule in motor vehicle search and seizure cases, the circumstances of which are almost endlessly variable. To provide

greater uniformity in the assessment of individual cases and more consistency with regard to the admissibility of the fruits of vehicular searches based on probable cause, a more easily applied rule—such as that of the federal automobile exception—is called for. *See California v. Acevedo,* 500 U.S. 565, 577, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (in the context of promulgating a rule for the warrantless search of motor vehicles and the containers found therein, reiterating "the virtue of providing clear and unequivocal guidelines to the law enforcement profession").

This position is supported by the fact that we, in agreement with the U.S. Supreme Court, have long considered the immobilization of a motor vehicle while securing a search warrant to be an *alternative* to the immediate search of the vehicle because it is far from clear which course constitutes the greater intrusion. *Baker,* 541 A.2d at 1383 ("[I]t is not clear that the intrusion arising from immobilization of an automobile is less than the intrusion of searching it."); *see also Chambers,* 399 U.S. at 51–52, 90 S.Ct. 1975 ("For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant", as which is the greater and which is the lesser intrusion is debatable and dependent upon a variety of circumstances). Thus, rather than demanding that police secure a warrant for every search of a motor vehicle where there is probable cause, we have concluded that the immediate search of a vehicle and the immobilization of the vehicle while a warrant is being obtained are constitutional alternatives.

Our review and research have revealed no unique Pennsylvania policy considerations that counsel in favor of a state standard for motor vehicle searches that is distinct from the federal standard.[17] Probable cause to search a motor vehicle

17. Appellee argues that the enhanced protection of individual privacy rights afforded by Article I, Section 8 requires a departure from federal law with regard to the automobile exception. *See* Appellee's Brief at 32–33, 35–36; *see also* Brief of Amicus Curiae, Pennsylvania Associa-

arises with regularity in the normal course of law enforcement in Pennsylvania as it does throughout the nation. We agree with the Supreme Courts of Rhode Island and Wisconsin that, unless a state constitution mandates a distinct result, and particularly when the relevant state and federal constitutional provisions are nearly identical, it is desirable to maintain a single, uniform standard for a warrantless search of a motor vehicle, applicable in federal and state court, to avoid unnecessary confusion, conflict, and inconsistency in this often-litigated area. *See Werner*, 615 A.2d at 1014; *Tompkins*, 423 N.W.2d at 829–30, 832.

■ In sum, our review reveals no compelling reason to interpret Article I, Section 8 of the Pennsylvania Constitution as providing greater protection with regard to warrantless searches of motor vehicles than does the Fourth Amendment. Therefore, we hold that, in this Commonwealth, the law governing warrantless searches of motor vehicles is coextensive with federal law under the Fourth Amendment. The prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required. The consistent and firm requirement for probable cause is a strong and sufficient safeguard against illegal searches of motor vehicles, whose inherent mobility and the endless factual circumstances that such mobility engenders constitute a *per se* exigency allowing police officers to make the determination of probable cause in the first instance in the field.

Here, there is no dispute that probable cause existed to search Appellee's motor vehicle. Nothing more is required. Therefore, we vacate the order of the Superior Court, and we reinstate Appellee's judgment of sentence.

tion of Criminal Defense Lawyers, at 13–20. We cannot agree for all the reasons discussed in the text, *supra*. The determination of enhanced privacy protections under some circumstances does not automatically translate into enhanced privacy protections wherever they may be asserted. Furthermore, Appellee fails to consider that, although motor vehicles are not unprotected by Article I, Section 8, the expectation of privacy therein is diminished. *See* text, *supra*.

Former Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justice EAKIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice TODD files a dissenting opinion in which Justice BAER joins.

Justice SAYLOR, concurring.

As reflected in the lead opinion, this Court has obviously had difficulty for quite some time in managing the appropriate contours of the automobile exception to the warrant requirement. Although I have some reservations, for the sake of certainty and consistency, I join the lead Justices in adopting the federal automobile exception.

I do wish to observe, however, that I find inconsistency in the courts' rejection of bright-line rules restraining law enforcement as a means of protecting individual rights,[1] while simultaneously embracing such rules when they facilitate law enforcement, *see* OAJC, at 124, 136–37. For my own part, I believe there would be benefit in maintaining some clear and appropriate boundaries operating in both directions. *Accord Perez*, 577 Pa. at 381–82, 845 A.2d at 792 (Saylor, J., concurring and dissenting) (concurring in the abandonment of one such bright-line rule protective of defendants' rights only because it had been consistently undermined by exceptions).

Justice TODD, dissenting.

I respectfully dissent. Pennsylvania has long been at the constitutional forefront in recognizing the vital necessity of

1. *See, e.g., Commonwealth v. Revere,* 585 Pa. 262, 281, 888 A.2d 694, 707 (2005) (quoting the United States Supreme Court for the proposition that "we have consistently eschewed bright-line rules [in the Fourth Amendment context], instead emphasizing the fact-specific nature of the reasonableness inquiry" (citation omitted)); *Commonwealth v. Perez,* 577 Pa. 360, 845 A.2d 779 (2004) (overruling previous decisions which had implemented a 6–hour rule governing the admissibility of pre-arraignment confessions, *inter alia,* as a means of protecting defendants' rights to be free from unreasonable seizure of their persons).

prior judicial approval of searches conducted by governmental officials, obtained through the warrant process, in order to maintain the fundamental right of the people to security from unreasonable searches and seizures. Consistent with that tradition, our Court has, heretofore, regarded warrantless searches of automobiles illegal under Article I, Section 8 of our Commonwealth's Constitution—except in those limited situations where both probable cause exists for such a search, and exigent circumstances, beyond the inherently mobile nature of the automobile itself, preclude obtaining a search warrant from a neutral magistrate. Pursuant to *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), a case which emphasized the paramount importance of Article I, Section 8 in safeguarding the fundamental human right to privacy enjoyed by the people of this Commonwealth, the plurality opinion in this matter incongruously now interprets that provision in a manner which severely diminishes its protections of the important personal privacy rights which owners and occupants of automobiles possess therein. The requirement that the ultimate decisionmaking authority for commencing an automobile search—a disruptive and invasive ordeal for those individuals whose vehicles are subjected to the search process—be vested in a neutral magistrate, and not the officer who will conduct the search, except in those instances where exigent circumstances make the obtaining of a warrant impracticable, is critical to ensure that the protections afforded by Article I, Section 8 to all owners and occupants of automobiles not be forsaken. However, our Court has now eliminated the time-honored and time-tested protection of our citizenry afforded by the interposition of the judgment of a neutral magistrate, through its wholesale adoption of the United States Supreme Court's "automobile exception" to the warrant requirement of the Fourth Amendment of the federal Constitution, which allows a search of an automobile based solely on the searching officer's determination that probable cause exists for such a search.

Moreover, our Court has chosen to eliminate this critical protection despite the undeniable fact that our society has

undergone a sweeping technological revolution over the many years which have elapsed since the time of the federal decisions on which the plurality opinion relies, seriously undermining the viability of their use as governing constitutional norms for vehicle searches in our modern society. As I explain at greater length herein, the federal automobile exception was first created by the high Court in the 1920's, seemingly in response to the practical difficulties of federal prohibition enforcement agents obtaining a search warrant for vehicles they suspected of transporting liquor, and then applied more recently by that Court in the mid–1980's because of a completely differing policy consideration—people's alleged diminished expectations of privacy in their vehicles. However, these rationales have been seriously eroded by both the advance of technology and the practical reality of how owners, operators, and passengers in automobiles utilize them in modern times. Today, the time it takes to obtain a search warrant for an automobile has been radically reduced, thanks in large measure to advances in communication technology which allow warrants to be obtained efficaciously by officers while they are still at the scene of an investigation. Other advances in technology have caused cars to become data repositories revealing the most discrete information about how and where individuals drive, whom they call from their car, and any number of other revealing insights into what they do in their daily lives. Likewise, for most people, the automobile, by consumer choice and by design, has become a rolling repository of their private possessions, which they keep shielded from public view during the significant amounts of time they spend therein. Some of these possessions, such as the laptop or smartphone, are digital treasure troves which contain significant amounts of highly sensitive personal and business information.

Most critically, as developed in greater detail *infra*, the federal approach discounts the vital individual privacy interests historically protected in this Commonwealth by Article I, Section 8. Indeed, it is seemingly contrary to the most recent public policy pronouncement of our legislature extending the

"Castle Doctrine" of self-defense, heretofore reserved exclusively for the home, to automobiles. I, therefore, deem the blanket espousal of such a relaxed standard as the controlling understanding of this integral provision of our own unique, organic charter of governance to be unjustified under the interpretational principles our Court articulated in *Edmunds,* and, thus, insufficient to safeguard the right of the people of Pennsylvania to be secure against unreasonable searches and seizures. Consequently, I must dissent from our Court's decision to impose such lockstep jurisprudential conformity with the high Court's interpretation of the federal Constitution.

## I. Evolution of the automobile exception under Pennsylvania Law

As the plurality has acknowledged, in its able recitation of our Court's prior decisions in this area, we have heretofore refused to sanction the search of an automobile without a warrant unless two essential requirements are met: (1) probable cause exists that the automobile contains evidence of criminal activity, and (2) exigent circumstances, beyond the inherent mobility of the automobile itself, preclude the searching officers from obtaining a warrant from a neutral judicial officer authorizing the search, prior to its commencement. *See Commonwealth v. Cockfield,* 431 Pa. 639, 246 A.2d 381, 383–84 (1968) (noting that "[w]henever practicable, the police must obtain advance judicial approval of searches and seizures through warrant procedure, and the failure to comply with the warrant procedure 'can only be excused by exigent circumstances' " and holding that, "[a]lthough it *sometimes* may be reasonable to search a movable vehicle without a warrant, the movability of the area to be searched is not alone a sufficiently 'exigent circumstance' to justify a warrantless search." (emphasis original)); *Commonwealth v. Baker,* 518 Pa. 145, 541 A.2d 1381, 1383 (1988) ("[C]ertain exigencies may render the obtaining of a warrant not reasonably practicable under the circumstances of a given case, and, when that occurs, vehicle searches conducted without warrants have been deemed proper where probable cause was present."), *overruled on other*

*grounds, Commonwealth v. Rosario,* 538 Pa. 400, 648 A.2d 1172 (1994); *Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896, 900 (1995) (searches without a warrant may be conducted only, *inter alia,* when there exists probable cause to believe the car contains evidence of criminal activity and exigent circumstances preclude the police from obtaining a warrant to conduct the search); [1] *Commonwealth v. Luv,* 557 Pa. 570, 735 A.2d 87, 93 (1999) (reading our Court's prior caselaw as establishing probable cause and the presence of exigent circumstances as the two "determining factors" justifying a warrantless search of a vehicle); *Commonwealth v. Hernandez,* 594 Pa. 319, 935 A.2d 1275, 1280 (2007) ("Warrantless vehicle searches in this Commonwealth must be accompanied not only by probable cause, but also by exigent circumstances beyond mere mobility; 'one without the other is insufficient.'" (quoting *Luv,* 735 A.2d at 93)).

I agree with the plurality that, until our *White* decision in 1995, we viewed the twin requirements of probable cause and exigent circumstances as mandated by both the Fourth Amendment to the United States Constitution and Article I, Section 8 of our own Constitution. *See Cockfield* (finding warrantless search of trunk of Appellant's car violated the Fourth Amendment and was not justified by exigent circumstances); *Baker,* (viewing warrant requirements of both the Fourth Amendment and Article I, Section 8 as applicable to automobiles). However, as the plurality recognizes, *see* Opinion Announcing the Judgment of the Court ("OAJC") at 120, *White* marked a clear break with the United States Supreme Court's caselaw in this area, which, by 1995, had abandoned the requirement that exigent circumstances must exist to excuse the failure to obtain a warrant prior to an automobile

1. I am in accord with the view expressed by Chief Justice Castille in his concurring opinion in *Commonwealth v. Perry,* 568 Pa. 499, 798 A.2d 697, 717–18 (2002) (Castille, J., concurring), that the third requirement articulated in *White* to dispense with a warrant for an automobile search—the occupants are likely to drive the vehicle away, resulting in the contents never again being located by the police, unless the car is immediately searched or impounded—was not required by our Court prior to that decision, nor have we required it in our subsequent jurisprudence.

search. As a result, I consider our decision in *White*, that suppression of evidence obtained from the search of the arrested driver's vehicle was compelled by Article I, Section 8, because the police had time and opportunity to obtain a search warrant prior to the search, to reflect a deliberate choice by our Court to chart an independent course in our jurisprudence under Article I, Section 8. From my perspective, it, thus, represented an intentional repudiation of the federal approach to such searches, an approach which, as I explain at greater length *infra*, gives what I deem to be insufficient consideration to, and protection of, the vital interest in individual privacy, secured by the warrant requirement of Article I, Section 8. I, therefore, regard *White* as constituting a watershed division between Pennsylvania jurisprudence and federal law on this subject, which preserved and continued our prior interpretation of Article I, Section 8 as requiring a warrant for automobile searches, unless exigent circumstances preclude procuring one. This clear separation between our jurisprudence under Article I, Section 8, and that of the United States Supreme Court under the Fourth Amendment, has been maintained by subsequent precedential decisions from our Court continuing to insist on both probable cause and exigent circumstances as justification for a warrantless search of an automobile. *See Luv*, 735 A.2d at 93 (both "the existence of probable cause and the presence of exigent circumstances" are required "to justify a warrantless search of a vehicle"); *Hernandez*, 935 A.2d at 1280 (the "dual requirement of probable cause plus exigency is an established part of our state constitutional jurisprudence").

Although the plurality now faults our Court for not conducting a formal four-part *Edmunds* analysis [2] in *White*, or any subsequent case, in support of its decision to establish this demarcation, I do not find the absence of such an analysis to undercut the validity or precedential force of those decisions

**2.** These factors are: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania interpretative case-law; (3) relevant case-law from other states; and (4) policy considerations, including unique issues of state and local concern. *Edmunds*, 586 A.2d at 895.

in their application of Article I, Section 8. Indeed, *Edmunds* does not mandate that a decision recognizing heightened protections of individual rights under the Pennsylvania Constitution utilize the four-part analytical framework of that case in order for it to be an authoritative interpretation of that charter; rather, its requirements are intended as a guide for litigants. *See Edmunds*, 586 A.2d at 895 (explicitly describing its four factors as ones "to be briefed and analyzed by **litigants** in each case hereafter implicating a provision of the Pennsylvania constitution." (emphasis added)); *Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295, 298 n. 2 (2001) (*"Edmunds* imposes no requirement on **this Court,** but instead, sets forth the briefing requirements for **litigants** seeking this Court's review of claims based exclusively on the Pennsylvania Constitution." (emphasis original)).

Nevertheless, as the plurality has aptly cataloged, it is undeniable that our decision to pursue such an independent path has, at times, generated divergent viewpoints among members of this Court regarding both the soundness of the jurisprudential rationale for this choice, as well as the scope of the exigency requirement itself. *See, e.g., Perry* (plurality) (Cappy, C.J., Opinion Announcing the Judgment of the Court; Castille, J., concurring; Saylor, J., concurring; Nigro, J., dissenting); *Commonwealth v. McCree,* 592 Pa. 238, 924 A.2d 621 (2007) (plurality) (Eakin, J., Opinion Announcing the Judgment of the Court; Cappy, C.J., concurring; Castille, J., concurring). Rather than viewing this disagreement as the product of an allegedly fundamental defect in *White* being perpetrated by its juridical progeny, I, instead, regard the differing expressions by various members of our Court in those cases to be based on their principled views regarding the manner in which Article I, Section 8 should be construed in the context of police vehicle searches. *See Perry*, 798 A.2d at 708 (Castille J., concurring) ("That probable cause arose unexpectedly is all the exigency I would require under Article I, Section 8—since that is all that is required by the actual holdings of this Court's cases explicating the automobile exception . . . and since any other rule is unjustifiably hostile to

perfectly reasonable police conduct."); *Hernandez*, 935 A.2d at 1290 (Saylor, J., concurring) ("I believe that ... adoption of the federal automobile exception subject to a warrant-when-practicable requirement, represents an appropriate stance and an essential resolution of the longstanding disharmony regarding fundamental principles governing police conduct in this line of cases.").[3]

Consequently, because the plurality, in light of the continuing tension existing among various members of our Court regarding this area of the law, has applied, in a scholarly and developed fashion, the *Edmunds* factors[4] to re-examine whether the choice to depart from federal law was proper, I will also address each of them. Contrary to the plurality's conclusion, however, I regard these factors to convincingly compel the rejection of a coterminous approach.

## II. *Edmunds* Analysis

### A. Comparative text of federal and state constitutional provisions

The conduct of an *Edmunds* analysis first necessitates that we examine the text of the governing state and federal constitutional provisions. Article I, Section 8 of the Pennsylvania Constitution provides:

**Security from searches and seizures**

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.

In comparison, the Fourth Amendment to the United States Constitution states:

---

**3.** Inasmuch as the extant competing views regarding the soundness of *White's* rationale have been comprehensively articulated and debated by our Court previously, *see e.g. Perry, McCree, Hernandez, supra*, I need not discuss them herein.

**4.** *See supra* note 2.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The plurality finds "nothing in the text of Article I, Section 8 to suggest that it confers greater protection than does the Fourth Amendment with regard to a warrantless search of a motor vehicle." OAJC at 125. I respectfully disagree. Unlike the Fourth Amendment, Article I, Section 8 uses the term "possessions," which our Court has previously interpreted to mean "intimate things about one's person," *Commonwealth v. Russo*, 594 Pa. 119, 934 A.2d 1199, 1214–15 (2007), and also specifies that no warrant to search "**any** place," or to seize "**any** ... things shall issue without ... probable cause." Pa. Const. art. I, § 8 (emphasis added). Inasmuch as these expansive terms are absent from the Fourth Amendment, this difference in language suggests that the warrant requirement of Article I, Section 8 was intended to protect an individual's privacy interest in **all** of his or her possessions or things in **any** place they may be, which would include, by necessity, when they are located inside of an automobile. I would, therefore, conclude that these textual differences support an interpretation of Article I, Section 8 broader than its federal counterpart in regard to the expectation of privacy owners and occupants of automobiles enjoy with respect to their personal possessions transported therein.

### B. History of Article I, Section 8 and interpretative caselaw

The second part of an *Edmunds* analysis involves an examination of the pertinent history of Article I, Section 8 and our Court's relevant interpretative case law.

### 1. The warrant requirement

This provision of our Commonwealth's Constitution has, from the time of its birth during our nation's revolutionary

summer of 1776, recognized and protected a natural and fundamental human right to privacy of our people. *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457, 467–68 (1983); *Edmunds*, 586 A.2d at 899 ("[O]ur Constitution has historically been interpreted to incorporate a strong right of privacy."). The architects of our first Constitution who acknowledged this fundamental right had firsthand experience, as subjects of the British Crown, with how this right could be diminished through the granting of exclusive decision-making authority to officials empowered to search an individual's person, or the places where the individual kept their most important possessions, as to whether a search would be conducted, and, if so, the time, place, and manner of the search. The people of colonial Pennsylvania suffered myriad invasions of privacy as the result of widespread, capricious general search and seizure practices, which did not require that the searching official obtain prior approval from a neutral judicial officer before conducting a particular search or seizure. The people's active resistance to these practices, and the concomitant attempts by our colonial judiciary to limit the powers of crown officials to carry out searches and seizures at their exclusive discretion, greatly influenced the framers of our original Constitution to provide security to the people of this Commonwealth against such unreasonable searches and seizures. They provided such security by including within that Constitution's Declaration of Rights a warrant requirement in order to specifically regulate the future conduct of searches and seizures by governmental officials. *See generally* J. Paul Selsam, *The Pennsylvania Constitution of 1776—A Study In Revolutionary Democracy* 182–83 (1971 reprint) (hereinafter "Selsam") ("[T]he Declaration of Rights was the true expression of the ideals of the American Colonists, and the guarantees contained therein were the product of long and severe experience.").

It is well established that the arbitrary search and seizure practices of the Crown's customs officers charged with the collection of various excise taxes, imposed without the consent of the American colonists, were an integral part of the "long Train of Abuses and Usurpations" suffered by them which

ultimately culminated in their fateful decision to seek independence from England. See Declaration of Independence (listing as one of the enumerated "repeated Injuries and Usurpations, all having in direct Object the Establishment of an absolute Tyranny over these States" the King of England's sending "hither swarms of Officers to harass our People and Eat out their substance."); Jacob W. Landynski, *Search & Seizure and the Supreme Court* 38 (1966); see also William Cuddihy, *The Fourth Amendment, Origins and Original Meaning* 779 (Oxford Press) (hereinafter "Cuddihy") (noting that the conduct of warrantless searches by customs officials prompted the Continental Congress to condemn the practice on three separate occasions in 1774 and to specifically denounce the power of customs officials to do so in an address to King George III).

Originally, customs officers claimed the plenary power to forcibly enter homes, warehouses, and other places to search for smuggled goods, without any warrant or other judicial authorization. Tracey Maclin, *The Central Meaning of The Fourth Amendment*, 35 Wm. & Mary L.Rev. 197, 219 (1993) (hereinafter "Maclin"). The customs officers contended that they possessed the inherent authority to conduct such searches *ex officio*, i.e., as pursuant to the powers of their offices bestowed upon them by their commissions. *Id.* at 220; Nelson Lasson, *The Fourth Amendment to the Constitution* 55 (1957) (hereinafter "Lasson"). However, because the invasive nature of the searches engendered great public opposition, officials of colonial governments attempted to mollify the populace by granting customs officers "general writs of assistance" to authorize such searches. Lasson, at 55. Initially, such writs were granted by executive officials of the colonial governments, such as the governor, as was the case in Massachusetts; however, the questionable legality of such practices was soon challenged, and the task of issuing such writs ultimately fell to colonial courts. Maclin, at 221.

Nonetheless, these court-issued writs fueled a gathering popular tempest, as the colonists came to view the manner of the customs officers' reliance on them to carry out sweeping

searches as an even greater affront to their privacy, which sparked increasing popular resistance that ultimately became, in the view of historians, a principal cause for the Revolution. Maclin, *The Complexity of The Fourth Amendment: A Historical Review*, 77 B.U. L.Rev. 925, 945 (2014). The chief focus of the colonists' ire was the fact that the writ gave customs officers "blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). As Professor Lasson elaborates, "[t]he discretion delegated to the official [with respect to his power to search] was ... practically absolute and unlimited. The writ empowered the officer and his deputies and servants to search, at their will, wherever they suspected uncustomed goods to be, and to break open any receptacle or package falling under their suspecting eye." Lasson, at 54. It is, therefore, unsurprising that the writs were ultimately and famously denounced by lawyer James Otis in *"Paxton's Case,"* [5] which challenged the legality of their issuance by the Massachusetts Supreme Court, as " 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' " *Stanford*, 379 U.S. at 481, 85 S.Ct. 506 (quoting *Boyd v. United States*, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886)).

Although Otis was unsuccessful in *Paxton's Case* in convincing the Massachusetts Supreme Court to adopt, as a replacement for the writ, a judicially issued specific warrant—limited as to the place to be searched and the items sought in the search—this outcome only increased the revulsion of the colonial populace to judicially unconstrained search practices. Indeed, popular opposition became sufficiently strong that it impeded customs officials from carrying out their search and seizure duties, due to the fact that, once people in an area became aware of the presence of the officers, mobs of angry people would routinely appear and carry away the goods

5. Quincy's Rep. 51 (Mass. 1761).

which the officers sought. Maclin, *Framing the Fourth,* 109 Mich. L.Rev. 1048, 1054 (2011). As this hostility spread throughout the colonies, the English Parliament responded by enacting the Townshend Revenue Act of 1767, which, to facilitate the obtaining of the writs by customs officers, empowered the highest court from each colony to issue them. *Id.* However, this engendered not only further opposition from the people, but also from the high courts themselves.

Nowhere was this opposition more acute than here in Pennsylvania, as reflected by the writings of the leading critic of the writ in the colonies, John Dickinson. Dickinson forcefully attacked the writ in his influential publication, "Letters of a Pennsylvania Farmer" which was widely read throughout the colonies and regarded as having "a pervasive, deep impact on colonial legal opinion." Cuddihy, at 546. Dickinson argued that the power of general search conferred by the writs, which extended to all places of privacy, including the innermost confines of a colonist's home, had been recognized even in England as "dangerous to freedom and expressly contrary to the common law," and he argued that the writs were "utterly destructive to liberty" since, unlike in England, the people here had no security "against the undue exercise of this power by the crown." Lasson, at 70 n. 67.

Although in the aftermath of the Townshend Revenue Act other colonial supreme courts declined to issue writs of assistance, our Court's colonial predecessor, along with that of Connecticut, was unique in basing its refusal to issue such writs on the fact that they failed to restrict searches to only specific places and enumerated items and did not require an official to disclose to a judicial officer, prior to a search, his reasons for conducting it. In rejecting a 1771 application for a general writ from the Philadelphia customs collector, John Swift, Chief Justice Allen of our Court informed Swift: "[I]f you will make oath that you have had an information that ... [smuggled goods] are in any particular place, I will grant you a writ to search that particular place but no general writ to search every house—I would not do that for any consideration." Cuddihy, at 520. Three years later, in 1774, when

customs officials applied again for blanket authorization to conduct searches at their discretion, our Court once more rejected the application on the basis of their view that "arming officers of the customs with so extreme a power to be exercised totally at their own discretion would be of dangerous consequences [and] was not warranted by Law." *Id.* at 525. Thus, our colonial high Court, along with Connecticut's, was in the vanguard of a gathering legal consensus in the colonies to reject general search and seizure practices in favor of ones authorized by a judicially issued specific warrant. Cuddihy, at 534–36.

This evolving preference towards taking the decisional authority for the conduct and scope of searches away from the officials who would perform them, and placing such authority in the hands of a neutral judicial officer who could narrowly tailor the search to only certain areas and items, based on the particular information presented to him, was further reflected legislatively in Pennsylvania. We, along with Massachusetts, were the only colonies to supplant the authority of our own excise collectors to conduct warrantless excise searches with a requirement that the searches be conducted pursuant to supplementary search warrants, which authorized searches of places based on information provided by the official on where he thought goods on which duty had not been paid might be found. Cuddihy, at 780.

These historical developments in Pennsylvania, reflecting popular and legal abhorrence of the arbitrariness of the pervasive general search practices under the rule of the English crown, and recognition of the need to constrain them through the use of specific warrants issued by neutral magistrates, were evidently of vital importance to the drafters of our first Constitution. Even though the members of our inaugural constitutional convention, who began their labors in July 1776 under the shadow of the gathering storm clouds of war with England, were confronted with numerous weighty matters such as selecting a basic form of government, they, nevertheless, immediately formed a "Bill of Rights Committee," and assigned as one of its primary tasks the drafting of

protections for the "freedom from arbitrary search." Burton A. Kunkle, *George Bryan and the Constitution of Pennsylvania 1731–1791* 119 (1980); Selsam, at 151; The product of their labors produced Article X of the Constitution of 1776, which provided:

> That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described are contrary to that right, and ought not to be granted.

Pa. Const. (1776) art. X.

This provision has been described by one scholar as "memorable because it [unlike earlier colonial constitutions] recognizes a right of the people in affirmative terms rather than merely declaring against general warrants or grievous searches." Leonard W. Levy, *Origins of the Bill of Rights* 169 (1999). Also remarkable was the fact that Article X secured the right of the people to be free from arbitrary search and seizure of their papers and possessions by requiring the use of specific warrants "to search suspected places" in which such papers and possessions might be found. I find it particularly noteworthy that Article X was the first post-colonial constitutional provision to contain a requirement that an officer, who wished to obtain such a specific warrant to search a particular place, or to seize particular items, swear or affirm to a neutral third party empowered to issue the warrant—most often a judge—that "[a] sufficient foundation" existed, factually, for the officer to conduct such a search or make such a seizure. *Id.* at 170. By inclusion of this requirement that a governmental official obtain authorization **prior** to conducting a particular search or seizure, Article X represents a deliberate and affirmative repudiation of the previously discussed judicially unsupervised search practices which the framers found so repugnant.

Especially relevant for purposes of this appeal, I agree with Professor Levy's observation that, while there exists no evidence to show the warrant requirement of Article X was intended to alter the long-standing common law rule that warrantless searches and seizures are permissible when required by exigent circumstances, Article X clearly required specificity as to places to be searched and items to be seized "when a warrant was attainable." *Id.* I, thus, consider Article X to reflect a strong "warrant preference" philosophy which regards specific warrants issued by a detached and neutral magistrate as the constitutionally required default search methodology, and which, correspondingly, views warrantless searches as authorized only in exceptional circumstances.

Consequently, the enactment of Article X—a full 15 years ahead of the adoption of the Fourth Amendment to the United States Constitution—enshrined the requirement of specific warrants issued by a neutral judge as an integral part of our state constitutional framework and, correspondingly, established such warrants as the main protection of the substantial privacy interests of our citizenry in every place where they choose to keep their most private papers and possessions. That our Commonwealth was the first to express a clear constitutional preference for the independent judgment of the judiciary regarding prior approval for, and conduct of, searches and seizures is significant, as it was a logical and natural outgrowth of the unique historical experiences of the people of Pennsylvania, who had long embraced specific warrants, issued after judicial review of specific justifying facts, but prior to any search or seizure taking place, as an effective legal means to ameliorate the harmful consequences of the deleterious warrantless search and seizure practices to which they were subjected. Based on this rich history, I regard our Constitution's warrant requirement to be one of singular and distinctive importance to Pennsylvania, in contrast to the later warrant requirement of the Fourth Amendment to the United States Constitution, which was based, in part, on this provision. *Edmunds,* 586 A.2d at 896.

Although the language of Article X was reworked in 1790, when it was transformed into Article I, Section 8, and an additional requirement that all warrants be "subscribed to by the affiant," was added in 1873, the basic values embodied in Article X are still reflected in the current version of Article I, Section 8. Article I, Section 8 continues to recognize a robust individual right of privacy in one's papers and possessions, and protects that privacy right through its warrant requirements for searches of "any place" such items may be found. *See Sell*, 470 A.2d at 467 ("[T]he survival of the language now employed in Article I, [S]ection 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth."); *Edmunds*, 586 A.2d at 897 ("Article I, Section 8 ... is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries."); *Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655, 665 (2000) (recognizing warrant requirement of Article I, Section 8 "furthers the concern for privacy"); Bruce A. Antkowiak, *Pennsylvania Criminal Procedure, Elements Analysis, and Application*, 168 (3d. ed.) ("Privacy is so valued a commodity in the Commonwealth that searches for evidence of crimes must, presumptively, be supported by a warrant."). Thus, in accordance with this strong historical tradition, the warrant requirement of Article I, Section 8 should be given the broadest reasonable application to searches conducted by governmental officials in this Commonwealth.

I note that, for nearly five decades from the mid 1920's until the 1970's, the United States Supreme Court construed the Fourth Amendment as requiring that a search of a vehicle for suspected contraband be conducted pursuant to a warrant, unless obtaining a warrant was not reasonably practicable; thus reflecting the same warrant preference philosophy as embodied in Article I, Section 8. As discussed by the plurality, this exception was first articulated in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), a case in which the high Court found the warrantless search of a suspected

bootlegger's vehicle by revenue agents, who were empowered by the National Prohibition Act of 1919 to immediately seize any liquor they discovered while it was in the act of being transported in an automobile, did not violate the Fourth Amendment since the search was supported by probable cause, and, also, because it was "not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll,* 267 U.S. at 153, 45 S.Ct. 280. However, the Court also emphasized that, "where the securing of a warrant is reasonably practicable, it **must** be used." *Id.* at 156, 45 S.Ct. 280 (emphasis added).

Gradually, however, in the 1970's, the high Court began to excuse the requirement of a warrant for searches of vehicles when such searches were conducted in circumstances other than as the result of stopping a vehicle while it was in transit on a public roadway. The Court, in justifying these searches, began to treat the entirety of an automobile as an area in which its owner or occupant possesses a diminished expectation of privacy—citing certain factors such as automobiles being exposed to public view and interaction with police officers during their operation, as well as being subjected to official regulation and inspection by governmental authorities. *See, e.g., Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (approving of the warrantless search of a towed vehicle pursuant to police "community caretaking functions," noting that "extensive, and often non-criminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband"); *South Dakota v. Opperman,* 428 U.S. 364, 367–69, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (approving of an inventory search of a vehicle impounded for violations of parking ordinances when such search was conducted pursuant to standard police procedures, and generally justifying "less rigorous warrant requirements" for the searches of automobiles on the basis of its determination that the expectation of privacy people possess in their automobiles is "significantly less" because of frequent contact by police with automobiles,

governmental regulation and controls on automobiles, and the fact that automobiles will frequently be taken into custody by police as a result of "caretaking and traffic-control activities").

This transformation of the high Court's caselaw culminated in the case of *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), where the court approved of the warrantless search of a mobile home parked in a public lot for suspected contraband, even though the mobile home sat for hours a mere two blocks from the courthouse, and, as noted by Justice John Paul Stevens in his dissent, a warrant could have been readily obtained from "dozens of magistrates" who worked there prior to the search. *Id.* at 404, 105 S.Ct. 2066. As discussed *infra*, the high Court primarily relied on the lesser expectation of privacy rationale to completely abandon *Carroll's* "warrant when reasonably practicable" requirement, and, instead, granted police a blanket search authority which allows an officer to search for contraband, simply on the basis of his or her on the scene assessment of the existence of probable cause. Under *Carney*, a police officer now need not seek any authorization for a search of a vehicle from a neutral magistrate prior to commencing the search, and the officer possesses exclusive discretion to decide whether he or she has probable cause to undertake the search, as well as the scope thereof. A warrantless search is therefore the default search methodology under the Fourth Amendment after *Carney*.

The reasons for such a paradigm shift by the high Court are unclear, given that it has never fully explained its rationale in electing to place primary emphasis on the factors it cited in *Carney*—which it imported from *Opperman*—in order to justify its complete dispensation with the warrant requirement. These factors were extant at the time of the *Carroll* decision as well, but apparently not regarded as sufficiently compelling for the Court to eliminate the warrant requirement in that case. Whatever the reason for this shift, however, the *Carney* standard—which eliminates, in all circumstances, the need for an officer to obtain a warrant from a neutral magistrate to search an automobile—is wholly inconsistent with Pennsylva-

nia's strong warrant preference philosophy of Article I, Section 8.

## 2. Privacy protections for automobiles

I agree with the plurality that we have regarded the enhanced privacy protections afforded by Article I, Section 8, as applicable only to "areas where an individual has a reasonable expectation of privacy," *Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295, 299 (2001), and that this expectation must be both subjectively held and objectively reasonable. *Russo,* 934 A.2d at 1211. I further acknowledge that our Court has previously stated that the expectation of privacy people possess in an automobile is not identical to that which they possess with respect to the interior of their home, or in the sanctity of their bodies. OAJC at 123–24 (quoting *Commonwealth v. Rogers,* 578 Pa. 127, 849 A.2d 1185 (2004) and *Commonwealth v. Holzer,* 480 Pa. 93, 389 A.2d 101, 106 (1978)). However, unlike the plurality, I do not view the expectation of privacy possessed by owners and occupants of automobiles to be so diminished as to be undeserving of the protections of Article I, Section 8. Indeed, our Court has recognized in the past that automobiles **do** fall under the protection of Article I, Section 8. *See Holzer,* 389 A.2d at 106 (Pa.1978) ("[T]here is no 'automobile exception' as such and ... constitutional protections are applicable to searches and seizures of a person's car."); *Baker,* 541 A.2d at 1383 ("It is well established that automobiles are not *per se* unprotected by the warrant requirements of ... Art. I, § 8 of the Pennsylvania Constitution."). I consider these suggestions to be eminently sound.

Recognition of an objectively reasonable expectation of privacy worthy of constitutional protection in an automobile is, of course, inconsistent with the now nearly 30–year–old pronouncement of the United States Supreme Court in *Carney,* which the plurality accepts, that "there is a reduced expectation of privacy stemming from [a vehicle's] use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling." *Carney,* 471 U.S. at 393, 105 S.Ct.

2066. As indicated, above, the high Court cited, as examples of such regulation, the inspection and licensing requirements of cars, and other motor vehicle code requirements governing the operation of cars on the public highways. *Id.* at 392, 105 S.Ct. 2066 (quoting *Opperman, supra*). In addition to the mobile nature of the automobile, a factor on which it had relied exclusively in *Carroll* to justify a more limited exception to the warrant requirement of the Fourth Amendment, the *Carney* Court relied heavily on these additional factors to completely dispense with the warrant requirement under the Fourth Amendment for automobile searches, reasoning that "[t]he public is fully aware that it is accorded less privacy in its automobiles because of this compelling governmental need for regulation," [6] and, thus, "the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable." *Carney* at 392–93, 105 S.Ct. 2066.

*Carney's* lesser expectation of privacy rationale has been roundly criticized as lacking a sound, logical foundation, as summed up cogently by Professor LaFave:

> When one rides in an automobile, he accepts that he himself and those items left uncovered on the dashboard or seat are no longer "private." In contrast, the driver or occupant of a vehicle who places objects under the seat, in a locked or unlocked glove compartment, or in a trunk does not surrender his expectation of privacy in those items.
>
>          \*      \*      \*
>
> There are probably few Americans who have not at one time or another used their cars for storage, albeit unwisely. All personal effects so stored are entitled to fourth amendment

6. Interestingly, it would appear that our country's populace as a whole may possess a greater expectation of privacy in their automobiles than the high Court has traditionally recognized. *See* Henry F. Fradella, *Quantifying Katz: Empirically Measuring 'Reasonable Expectations of Privacy' in the Fourth Amendment Context,* 38 American Journal of Criminal Law 289, 364 (2011) (noting that, respondents to a nationwide survey, "[b]y a 52.3% to 35.8% margin, rejected the so-called 'automobile exception' to the Fourth Amendment warrant requirement as set forth in *Carroll*.").

protection; constitutional guarantees are not reserved only for valuable possessions carefully protected by their owners. Most Americans view the automobile as more than merely a means of transportation.

Finally, the high degree of government regulation does not support the excessive diminution of fourth amendment protection of the automobile which accompanies application of the automobile exception. A legitimate interest in securing compliance with safety and traffic regulations should not be used to justify a reduced expectation of privacy in the entire vehicle.

Wayne R. LaFave, *Search and Seizure: A Treatise on The Fourth Amendment* 734–35 (5th Ed. 2012); *see also* Carol A. Chase, *Privacy Takes a Back Seat: Putting the Automobile Exception Back on Track After Several Wrong Turns,* 41 B.C.L.Rev. 71, 91 (1999) (observing that most jurisdictions in America have significant legal regulations governing residential property, yet that does not justify finding a reduced expectation of privacy therein which would excuse the requirement of police obtaining a warrant to search home); Joseph D. Grano, *Rethinking the Warrant Requirement,* 19 Am.Crim. L.Rev. 605, 638 (1982) (hereinafter "Grano") ("The fact that police may examine license plates, inspection stickers, headlights, exhaust systems, and other such things hardly proves that one has a reduced expectation of privacy in items held in the glove compartment, under the seat, or in the trunk.").

I find these criticisms to have substantial merit as, in my view, the mere operation of a vehicle on a public highway does not *ipso facto* eliminate the operator's or owner's expectation of privacy in areas of the vehicle secured against public view, such as the trunk or the glovebox, any more than a pedestrian's act of walking on the public streets eliminates his or her expectation of privacy for the areas underneath his or her clothing, or in his or her wallet or purse. Neither the fact that a motor vehicle is registered with the Commonwealth [7]—a brief process in which the owner submits a registration form and fee to the state, and does not involve any governmental

7. 75 Pa.C.S.A. § 1301.

official searching the vehicle or its contents—or the requirement of the Motor Vehicle Code that a registered vehicle undergo a once yearly inspection[8]—which is not done by a state enforcement official, but rather by a private individual selected by the vehicle owner, and limited in scope and purpose to ensuring that the mechanical components of the vehicle can safely operate—justify compelling all owners or operators of motor vehicles to surrender their reasonable expectation of privacy in the areas of their vehicles secured against public view. Likewise, the average Pennsylvania motorist does not reasonably expect that if he or she is stopped for an alleged violation of the laws regulating travel on our Commonwealth's roadways that this will automatically result in the police officer conducting a complete search of the entire vehicle. *Cf. Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (Fourth Amendment does not permit full search of vehicle simply because of the issuance of a speeding citation).

Perhaps more importantly, to find that present-day owners or occupants of automobiles do not have an objectively reasonable expectation of privacy therein ignores the practical realities of the manner in which these conveyances are used in modern society, and, also, how they are viewed by their owners and occupants. While some state courts have accepted, without serious scrutiny, *Carney's* mantra that an individual has such a lessened expectation of privacy in his or her automobile that it is unworthy of the protection of the warrant requirement of their own constitutions[9], this disregards the plain fact that today's automobile is not just used to transport persons, but, also, to store and transport a myriad of their most private belongings. For most individuals who own or ride frequently in cars, the automobile functions as a veritable storehouse of their intimate personal possessions, i.e., their "home away from home." As aptly noted by one commentator in this regard:

8. 75 Pa.C.S.A. § 4702(a).

9. See *infra* notes 12–13 and accompanying text.

[Automobiles] store the suit or dress that one keeps forgetting to leave at the cleaners, the bank statement that should be brought inside the house, the library book that should be returned, the briefcase that will be needed at a subsequent meeting, the work one had planned to do overnight, and sundry items permitted, deliberately or from laziness, to remain in the car until some other day.

Grano, at 637.

Further, as part of the routine ritual of modern life, people transport in their automobiles, and often store for periods of time in them, their laptops, smartphones and other digital devices, which contain a plethora of intimate and elaborate details about their daily lives, their personal financial records, their interactions with family and friends, and their innermost thoughts. Indeed, one jurist has memorably illustrated the highly sensitive and private nature of the type of materials which are regularly carried and stored in an automobile by observing: "[T]he workload of this court often requires judges to take their work home. The automobile provides the usual mode of transporting drafts of opinions, notations indicating the probable outcome of submitted cases, and confidential messages from other judges." *U.S. v. Edwards*, 554 F.2d 1331, 1338 (5th Cir.1977), *vacated U.S. v. Edwards*, 577 F.2d 883 (5th Cir.1978). Consequently, the personal items stored or transported in an automobile constitute the very type of private "papers and possessions" which are secured against unlawful search and seizure by Article I, Section 8.

Moreover, and importantly, I note that automobiles are specifically designed and built with features such as trunks, glove boxes, and internal storage compartments, some of which may only open with a special key, in order to allow personal items to be deliberately secreted from public view during transport. Hence, the deliberate provision by automakers of these private places as standard features of every car, and their frequent utilization by the owners and occupants of cars to store items out of public sight, evidences a societally reasonable expectation that the privacy of all such areas in an automobile shielded from public view will be afforded the

maximum degree of protection from unlawful and unjustified intrusion.

Additionally, the modern automobile itself is outfitted with a multiplicity of electronic devices, not in existence at the time of the *Carney* decision, which catalog, in minute detail, the personal information and life activities of the automobile's user. "Black boxes" also known as "event data recorders," which currently are standard equipment for 96 percent of all new vehicles sold annually in the United States, and which will eventually be a part of every new car sold, record at all times while a vehicle is being driven and, thus, capture a multitude of facts regarding the vehicle's operation.[10] Such facts include the speed of the vehicle, its direction of travel, turn signal activation, seat belt usage by all occupants, and the Global Positioning System ("GPS") coordinates of the vehicle at every point in its movements. Bozeman, *Automobile "Black Boxes": Is the Fourth Amendment a Crash Test Dummy?* 44 (No. 2) Crim. Law Bull. 2 (2008). Further, today's vehicles, using extant "Bluetooth" computer technology, can interface with an occupant's electronic data storage device such as a mobile phone or laptop so that the car collects and stores therein the user's telephone contact lists, song collections, video and audio recordings and a growing number of other personal electronic files. Indeed, as a stark illustration of the seemingly limitless type of sensitive personal information which a car can now acquire and retain, current Bluetooth technology permits a user to share his or her "real time" blood glucose levels from a personal blood sugar monitoring device with the car so that these levels are continually displayed on a dashboard view screen. *See* http://www.bluetooth.com/Pages/cars.aspx (last visited 3/22/14). This capacity for a car to function as an electronic warehouse for its owner's or occupants' personal data will only grow in the future as engineers develop new ways for vehicle users to share personal data with their cars, such as allowing the driver and passengers to surf the Internet while in transit from a tablet computer that pops out of

10. *See generally* Jaclyn Tropa, *A Black Box for Car Crashes,* N.Y. Times, July 21, 2013, at B1.

the dashboard. Cecilia Kang, *As Automakers Tap Smart-phone Technology, Concerns Grow About Use of Drivers' Data,* Wash. Post, January 9, 2014, available at http://www.washingtonpost.com/business/economy/as-automakers-tap-smartphone-technologyconcerns-grow-about-use-of-drivers–data/2014/01/09/91a505f2–78a0–11e3–b1c5–739e63e9c9a7_story.html (article available only on the Internet). Concomitantly, the need for legal protection for the privacy of the growing volumes of personal data collected by automobiles will only become greater with the passage of time.

Another significant factor weighing heavily in favor of recognizing a reasonable expectation of privacy in an automobile is the fact that it has come to be regarded by most Americans as something more than just a means of transportation. It is viewed, for those who routinely travel in it, as a place of refuge and protection from the external world and the stresses of modern life. Today's vehicles are deliberately engineered to insulate the drivers and passengers from as many extraneous disturbances as possible, and people frequently take maximum advantage of this insularity to "get away from it all" by taking long evening, weekend, or vacation drives. Even in their daily lives, more people still opt for driving than taking public transportation, in large measure because of the privacy the vehicle affords them while in transit. As William Safire has cogently observed in this regard: "[M]ost people ... prefer vehicles of their own. Certainly a strong reason must exist for commuters to go into hock to buy a car, to sweat out traffic jams, to groan over repair bills. That reason is, simply: the blessed orneriness called privacy." Katz, *Automobile Searches and Diminished Expectations in the Warrant Clause,* 19 Am.Crim.L.Rev. 557, 571–72 n. 79 (1982) (quoting William Safire, *The Great American Love Affair,* Readers Digest, May 1976, at 179).

I also find compelling support for the notion that the inside of an automobile should be treated in this Commonwealth as an area akin to the inside of a home, with respect to the legal protections afforded to persons and property therein, from our legislature's recent decision to extend the "Castle Doctrine"—

"a common law doctrine of ancient origins which declares that a home is a person's castle"—to vehicles.[11] *See* 2011 Pa. Legis. Serv. Act 2011–10, finding 2. Notably, in so doing, the General Assembly found that "[p]ersons residing in or visiting this Commonwealth have a right to expect to remain unmolested within their **homes or vehicles**." *Id.* at finding 4 (emphasis added). This legislatively recognized equivalence is, for me, a clear indication that the public policy of this Commonwealth supports the modern societal perspective that individuals are entitled to similar broad protections of the law in the use and enjoyment of their automobiles as those which they enjoy with respect to their home. In sum, I deem owners and occupants of automobiles to have a societally recognized, objectively reasonable expectation of privacy therein which is worthy of the protections of the warrant requirement of Article I, Section 8.

For all of these reasons, I view the adoption of the *Carney* standard as anathema to the unique history and interpretation by our Court of Article I, Section 8 discussed above, as it removes the interposition of the judgment of a neutral magistrate in the automobile search process by eliminating the warrant requirement of Article I, Section 8 for all searches of vehicles, and thereby eviscerates its critical role in protecting the important right to privacy of all motorists of this Commonwealth against unreasonable searches and seizures of their cars. Therefore, I find this *Edmunds* factor strongly counsels against the wholesale utilization of the *Carney* standard as the governing legal standard for automobile searches in this Commonwealth.

## C. Caselaw from other jurisdictions

The third factor of an *Edmunds* analysis involves an assessment of the decisions of our sister states. Initially, I note that some states which do not generally recognize a strong right to individual privacy protected by their own constitutions have elected to conform their state constitutional jurisprudence in

11. *See* 18 Pa.C.S.A. § 501 (defining vehicles as "[a] conveyance of any kind, whether or not motorized, that is designed to transport people or property.").

this area to *Carney*, by wholly adopting the federal automobile exception in applying the search and seizure provisions of their own constitutions to automobile searches, and they allow warrantless searches of automobiles based exclusively on an officer's determination that probable cause exists to do so.[12] Because these jurisdictions do not share our Commonwealth's robust historical commitment to the protection of the right of privacy, I find their decisions, several of which were relied on by the plurality, to be of little guidance for the purposes of *Edmunds*.

Instead, I find persuasive the weight of authority from other jurisdictions, which have traditionally shared Pennsylvania's view that the individual privacy rights of their populace are entitled to greater protections under various provisions of their state constitutions, and have, with some exceptions noted below, in accordance with that recognition, explicitly refused to follow *Carney*.[13] These states' high courts flatly reject *Carney's* "lesser expectation of privacy" rationale as insufficiently compelling to cause them to abandon the greater protections against warrantless searches of automobiles which they previously recognized under their own state constitutions, and they continue to require a warrant for automobile searches, unless there exists both probable cause and exigent circumstances which prevent the searching officer from obtaining one. *See, e.g., State v. Sterndale*, 139 N.H. 445, 656 A.2d 409, 411 (1995) (holding that, because New Hampshire Constitution provides "significantly greater protection than the fourth amendment against intrusion by the State," the

12. *See State v. Lloyd*, 312 P.3d 467 (Nev.2013); *State v. Zwicke*, 767 N.W.2d 869 (N.D.2009); *McKenney v. State*, 165 P.3d 96 (Wyo.2007); *State v. Werner*, 615 A.2d 1010 (R.I.1992); *State v. Conn*, 278 Kan. 387, 99 P.3d 1108 (2004); *State v. Tompkins*, 144 Wis.2d 116, 423 N.W.2d 823 (1988).

13. Although Colorado, Tennessee, Kentucky and Massachusetts recognize a greater right of privacy under their own constitutions, in some circumstances, these states have chosen to follow the federal automobile exception in applying the search and seizure provisions of their constitutions to automobile searches. *See People v. Hill*, 929 P.2d 735 (Colo.1996); *State v. Saine*, 297 S.W.3d 199 (Tenn.2009); *Chavies v. Commonwealth*, 354 S.W.3d 103 (Ky.2011); *Commonwealth v. Cast*, 407 Mass. 891, 556 N.E.2d 69 (1990).

reduced expectation of privacy rationale was "not persuasive" as an interpretation of that provision); *State v. Gomez*, 122 N.M. 777, 932 P.2d 1, 12 (1997) (refusing, following *Carney*, to relax search and seizure provisions of the New Mexico Constitution which reflect a strong preference for warrants and, also, imposing the additional requirement of a particularized showing of exigent circumstances to justify excusing the warrant requirement).

The Montana Supreme Court's decision in *State v. Elison*, 302 Mont. 228, 14 P.3d 456 (2000), is particularly instructive. Therein, the court expressly refused the state's invitation to follow *Carney* and abandon the twin requirements of probable cause and exigent circumstances for a warrantless search of an automobile, which it previously interpreted the Montana Constitution [14] to require. Echoing the criticisms of *Carney*, recounted above, the Court reasoned:

> [W]hen a person takes precautions to place items behind or underneath seats, in trunks or glove boxes, or uses other methods of ensuring that those items may not be accessed and viewed without permission, there is no obvious reason to believe that any privacy interest with regard to those items has been surrendered simply because those items happen to be in an automobile. Furthermore, there is no reason to believe that the 'pervasive and continuing governmental controls and regulations' of automobiles could serve to reduce someone's expectation of privacy in items so stowed. Although the State may have a legitimate interest in securing compliance with safety and traffic regulations, there is absolutely no logical connection between prohibitions such as driving with expired registration stickers or a noisy muffler, and the State's need to conduct a warrantless search behind the seat of an automobile. Visual inspections

14. Although, in addition to its reliance on the provision of the Montana Constitution governing searches and seizures, the Montana Supreme Court also founded its decision, in part, on Article II, Section 11 of its charter, which explicitly guarantees a right to privacy; however, as developed above, we have consistently interpreted Article I, Section 8 of our Constitution as incorporating the same "strong right of privacy," *Edmunds*, 586 A.2d at 899; thus, its rationale is fully applicable.

of license plates for expired tags do not entail searches of glove boxes, trunks, and underneath seats.

*Id.* at 470. Significantly, the Montana Supreme Court also reminded that, because a search of a car is an invasion of the owner's or operator's constitutionally protected privacy interests in the items stored therein, the state is required to provide procedural safeguards when it invades those interests. The court noted it is, therefore, the type of search which "typically requires a warrant or other special circumstances," and it refused to allow a search solely on the basis of the existence of probable cause. *Id.*

Similarly, the highest court of our sister state of New Jersey in *State v. Cooke*, 163 N.J. 657, 751 A.2d 92 (2000), recognized, as our Court has done previously, that, though there may be a lesser expectation of privacy in one's automobile, that expectation is not so attenuated that, standing alone, it constitutes sufficient justification to conduct a warrantless search thereof—absent exigent circumstances making it impracticable for police to obtain a warrant. That court also rejected *Carney* as the standard under its state's constitution, based on its reaffirmation that its state constitutional protection against unreasonable searches and seizures, like ours, embodies "a constitutional preference for a warrant, issued by a neutral judicial officer, supported by probable cause." *Cooke*, 751 A.2d at 99. The court reminded that "[t]he cautionary procedure of procuring a warrant ensures that there is a reasonable basis for the search and that the police intrusion will be reasonably confined in scope." *Id.*

As noted by the plurality, the high courts of Washington and Vermont, which also recognize a strong individual right to privacy under provisions of their state constitutions—either explicitly via a separate amendment (Washington) or through interpretation of the provision generally regulating searches and seizures (Vermont)—have also refused to allow warrantless searches of motor vehicles solely on the basis of a police officer's determination of probable cause. Although these decisions did not directly address the applicability of *Carney* under their state constitutions, they, nevertheless, are in

accord with the fundamental principles of the decisions discussed above in that they continue to view a warrant as the bedrock means of protecting the privacy interest an owner or occupant of a vehicle has in areas of automobiles outside of public view, and, thus, mandate that those areas may not be searched without a warrant, unless exigent circumstances exist that make the obtaining of a warrant impracticable. *See State v. Tibbles,* 169 Wash.2d 364, 236 P.3d 885, 890 (2010) (ruling that suppression of contraband found under front passenger seat was properly suppressed under Washington constitution due to officer's failure to obtain a warrant, even though he possessed probable cause to suspect marijuana was in the vehicle, due to the lack of any exigent circumstances which prevented him from obtaining a warrant such as "delay inherent in securing a warrant [which] would compromise officer safety, facilitate escape, or permit the destruction of evidence."); *State v. Bauder,* 181 Vt. 392, 924 A.2d 38, 43 (2007) (upholding suppression of contraband found under and behind the driver's seat, and in a compartment in the driver's side door, during warrantless search of the vehicle after driver was arrested for DUI, noting lack of exigent circumstances to excuse obtaining a warrant and emphasizing that "[t]he warrant requirement serves as a check on the executive power by guaranteeing review by a neutral and detached magistrate *before* a search is carried out, thereby deterring 'searches on doubtful grounds' and assuring the people of 'an impartial objective assessment' prior to a governmental invasion."). I note also that the high Court of Hawaii continues to maintain, under its own constitution, dual requirements for a warrantless search of a vehicle: probable cause that contraband is located within the vehicle and "reason to believe that because of the car's mobility or exposure, there is a foreseeable risk that it may be moved or that the evidence which it contains may be removed or destroyed before a warrant can be obtained." *State v. Phillips,* 67 Haw. 535, 696 P.2d 346, 350 (1985); *State v. Wallace,* 80 Hawaiʻi 382, 910 P.2d 695, 713 n. 16 (1996).[15]

**15.** A plurality of the Utah Supreme Court, which has interpreted the search and seizure provision of the Utah Constitution to provide a

In sum, I find these decisions from courts of our sister states which have not accepted the *Carney* standard as the controlling interpretation for their own constitutions to be more persuasive, as they are wholly consonant with our Court's long-standing interpretation of Article I, Section 8 as embodying both a strong individual right to privacy of individuals, and a strong preference for the utilization of the warrant procedure in recognition of the vital role it plays in protecting that right.

## D. Policy considerations

The final prong of the *Edmunds* analysis is an examination of relevant policy considerations at stake, particularly those of state and local concern in our Commonwealth. In this regard, I observe that, not only has our Court steadfastly protected the important right of personal privacy by insisting, through our decisions, on the use of a warrant for searches of all areas in which our citizenry has a reasonable privacy interest, unless not reasonably practicable, we have also purposefully sought to encourage the use of warrants to conduct searches by making them far easier for police officers to obtain in conducting field investigations. Over a decade ago, in 2002, our Court amended our Rules of Criminal Procedure to allow the use of

greater expectation of privacy than the Fourth Amendment, has endorsed the dual requirements of probable cause and exigent circumstances for a warrantless search of an automobile. *State v. Anderson,* 910 P.2d 1229 (Utah 1996) (plurality); *State v. Larocco,* 794 P.2d 460 (Utah 1990) (plurality). The Oregon Supreme Court has drawn a distinction in its application of the federal automobile exception under the search and seizure provision of its constitution which allows a warrantless search of a vehicle on probable cause when the vehicle has "just been lawfully stopped by police;" however, it requires a warrant issued by a neutral magistrate when the vehicle is "parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime," unless exigent circumstances other than the mobile nature of the automobile itself are present. *State v. Kock,* 302 Or. 29, 725 P.2d 1285, 1287 (1986). Connecticut, in interpreting its own constitution, has adopted only a limited version of the federal automobile exception which allows a warrantless search on probable cause when the automobile remains in a public place after the arrest of the driver; however, if the vehicle is impounded and towed to the police station, then a warrant is required to search it. *State v. Winfrey,* 302 Conn. 195, 24 A.3d 1218 (2011).

advanced communications technology to enable an officer to obtain a search warrant from a magistrate without having to physically depart from the scene and personally appear before the magistrate. Pa.R.Crim.P. 203, setting forth the requirements for issuance of search warrants, now provides, in relevant part:

**Rule 203. Requirements for Issuance**

(A) In the discretion of the issuing authority, advanced communication technology may be used to submit a search warrant application and affidavit(s) and to issue a search warrant.

(B) No search warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority in person or using advanced communication technology. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.

(C) Immediately prior to submitting a search warrant application and affidavit to an issuing authority using advanced communication technology, the affiant must personally communicate with the issuing authority by any device which, at a minimum, allows for simultaneous audiovisual communication. During the communication, the issuing authority shall verify the identity of the affiant, and orally administer an oath to the affiant.

Pa.R.Crim.P. Rule 203. Advanced communication technology ("ACT") is further defined by the Rules of Criminal Procedure as "any communication equipment that is used as a link between parties in physically separate locations, and includes, but is not limited to: systems providing for two-way simultaneous communication of image and sound; closed-circuit television; telephone and facsimile equipment; and electronic mail." Pa.R.Crim.P. Rule 103.

As noted by our Criminal Procedural Rules Committee, in its explanatory report prepared pursuant to adoption of these rules, these revisions were made with the purposeful goal of reducing the number of warrantless searches, because

searches with a warrant are so strongly favored in this Commonwealth. The Committee explained its reasoning as follows:

> [T]here are a sufficient number of 'warrant' situations in which time and convenience are important, and [the Committee] expects that the new ACT provisions will (1) reduce the amount of time it takes to obtain a warrant, and (2) increase the convenience to both affiant and issuing authority. **In addition, the Committee agreed with the concept that proceeding with a warrant is favored over proceeding without a warrant, and using ACT will reduce the number of warrantless arrests and seizures.**

Pa. Bull. vol. 32, no. 21 at 2595 (5/25/02) (emphasis added). Consequently, the adoption of these rules reflects a strong policy choice by our Court to maximize the use of judicially issued warrants by police in the field who wish to conduct searches, by providing a modern update to the warrant application process which facilitates rapid communication between them and the issuing magistrates. Although the rules do not require magistrates to use this process, as a rule of statewide applicability, it nevertheless permits the utilization of these procedures in every county of this Commonwealth, and, thus, insures and strengthens compliance with the warrant requirement of Article I, Section 8.

Adoption of this rule was a clear recognition by our Court that search warrant application procedures have advanced dramatically from the "Model T and vacuum tube radio" technology extant at the time of the *Carroll* decision, and now permits an officer to do in minutes what would have taken many hours, or perhaps even days, in 1925. As discussed *supra,* the length of time required to obtain a search warrant was a factor of considerable importance to the *Carroll* Court in finding that an immediate warrantless search on probable cause was justified, given the possibility the vehicle could be driven away before a magistrate could be found to consider a warrant application. However, this concern has been significantly lessened by the advent of the above enumerated modern technological means to enhance communication between officers in remote locations and magistrates, which technology

has only improved in both quality and availability since the original promulgation of Pa.R.Crim.P. 203.[16]   The *Carney* Court, in fashioning its broad warrantless search rule, did not consider, at all, the impact such rapid communications technologies—in development at the time that case was heard—would have on the speed and ease of obtaining a warrant for the search of an automobile, and, thus its persuasiveness as a basis to impede the operation of this state rule, and thereby impact the administration of justice in this Commonwealth is severely undermined.

Nevertheless, I find it significant that, even though the time required to obtain a warrant was considerably longer in the 1920's, the *Carroll* Court, as related above, expressed a warrant preference which was in alignment with our current state constitutional standard, i.e., "where the securing of a warrant is reasonably practicable, it must be used." *Carroll*, 267 U.S. at 156, 45 S.Ct. 280.   Today, in this Commonwealth, as the result of Rule 203, which seeks to maximize the use of advanced communication technology, obtaining a search warrant is **quite** reasonably practicable;  accordingly, as is constitutionally required, it should remain the first choice, unless exigent circumstances foreclose an investigating officer from obtaining it.   I deem adherence to these requirements as affording our police officers a clear and understandable standard to guide them, as sought by the plurality, and I consider police officers eminently capable as trained professionals of making the basic assessment of whether it is reasonably practicable for them to seek a warrant, under all of the circumstances existing at the time they wish to search an automobile.

Moreover, in my view, the immobilization of a vehicle, pending a magistrate's determination, better effectuates Article I, Section 8's strong safeguards for individual privacy.[17]

16.   For example, computer programs such as "Skype" or "FaceTime," which permit instant two way audio and video communication over computers and smartphones, are now widely available, easy to use, and relatively inexpensive.

17.   The United States Supreme Court held in *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), that there is no

The impact on individual privacy occasioned by the immobilization of a vehicle while an officer seeks a search warrant from a magistrate is, from my perspective, far less than that which results from a full search of a vehicle. The disruption of individual privacy while a magistrate considers a search warrant application is limited to the temporary loss of the vehicle's use, which, especially if the procedures set forth in Pa.R.Crim.P. 203 are utilized, will usually be brief, and, most significantly, avoids any invasion of the vehicle's interior and disturbing of its contents prior to a judicial determination of whether the search is lawful under our Constitution. Further, it bears emphasis that the process of judicial consideration of a warrant application, guaranteed by Article I, Section 8, is a citizen's sole means by which he or she may attain judicial review of the legality of a search **prior** to it occurring. *See Brinegar v. U.S.*, 338 U.S. 160, 182, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J. dissenting) ("We must remember ... that freedom from unreasonable search differs from some of the other rights of the Constitution in that there is no way the innocent citizen can invoke advance protection.").

In summary, I determine that these policy interests strongly weigh in favor of not utilizing the *Carney* standard to assess whether searches of automobiles comport with the requirements of Article I, Section 8.

### E. Summary of *Edmunds* factors

Based upon the foregoing examination of the *Edmunds* factors, I conclude that the text of Article I, Section 8, the unique and rich history surrounding its origins, its subsequent interpretation by our Court, relevant case law of other states, but especially those which share both our Commonwealth's commitment to protecting the right of privacy and our regard for the warrant process as a vital procedural safeguard for

difference, for "constitutional purposes," between an immediate full search of a vehicle and impoundment of that vehicle while application to a magistrate for a warrant is made. In *Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346 (1985), we commented on the holding of *Chambers*, but we did not endorse or adopt it as a matter of our state constitutional jurisprudence.

that right, as well as important policy considerations, all support interpreting Article I, Section 8 as offering heightened protections of the right of individual privacy a person possesses in his or her automobile as a driver or occupant. Consequently, in my view, the present safeguard for this privacy right provided by the warrant process of Article I, Section 8—requiring the authorization of any search of an automobile to be made by a neutral magistrate, except in those limited exigent circumstances where obtaining such a warrant is impracticable—should be maintained.

## V. *Conclusion*

Because the search of Appellee's vehicle in this case occurred while he was in custody, and, therefore, ample opportunity existed for the police to obtain a search warrant from a neutral magistrate prior to searching it, I would affirm the Superior Court's decision in this matter suppressing the evidence recovered during the warrantless search of its engine compartment. Our Court, by adopting the diluted federal automobile exception and sanctioning the search of Appellee's vehicle under Article I, Section 8, based solely on the officer's determination of probable cause, has eviscerated the strong privacy protections that amendment affords the people of Pennsylvania in their automobiles. By so doing, our Court heedlessly contravenes over 225 years of unyielding protection against unreasonable search and seizure which our people have enjoyed as their birthright. I cannot join our Court in this endeavor, as it is so diametrically contrary to the deep historical and legal traditions of our Commonwealth. As Mr. Justice Jackson observed so persuasively over a half century ago, and which principle remains just as viable today: "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." *Johnson v. U.S.*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). I therefore respectfully dissent.

Justice BAER joins this dissenting opinion.